# THE STATE v. FRANK DALY, Alias A. C. BILES, Appellant.

### Division Two, March 31, 1908.

1. **EVIDENCE: Res Gestae: Conduct and Statements.** The movements, actions, conduct, and voluntary statements of a defendant, made or done after the commission of the alleged offense, are always admissible in evidence against him, whether a part of the *res gestae* or not.

2. **————: ————: ————: Accomplice: Cautionary Instruction.** And such conduct or statements may be testified by defendant's accomplice, the court giving a cautionary instruction thereto.

3. **EXPERT: Qualification: Preliminary Question.** The question of whether a witness possesses the necessary qualifications to render him competent to testify in the character of an expert, is a preliminary one to be passed upon by the trial court after an examination of the witness.

4. **————: ————: Witness's Statement.** A witness who subjected the viscera of the deceased to a chemical examination may be an expert, though he says he is not an expert. Knowledge of the matters concerning which the witness testifies and familiarity with the subject then under consideration are the tests. The weight to be given to his testimony is for the consideration of the jury.

5. **EVIDENCE: Post-Mortem Examination: Accounting for Stomach, Etc.** It is not incumbent upon the State to account for the whereabouts of the stomach and intestines of the deceased from the time of the post-mortem examination by the coroner on one day to the afternoon of the next day when the viscera were removed from the body at the morgue by the undertaker and embalmer. Nothing appearing to the contrary, it must be presumed that the body and the viscera remained in the care of the keepers of the morgue, where the autopsy was held and the post-mortem examination was made, until delivered to the undertaker.

6. **MURDER: Failure to Define Premeditation and Malice Aforethought.** Where poison is administered, wilfully and deliberately, in the perpetration of a robbery, and death ensues, the killing, under the provisions of the statute (Sec. 1815, R. S. 1899), is murder in the first degree, and premeditation and malice aforethought are not elements of the offense, and it is, therefore, not necessary to define these terms in the instructions,

and a failure to do so is not reversible error, though it would be in an ordinary case of murder in the first degree.

7. **CORROBORATION:** Accomplice: **Instruction.** An instruction which told the jury that "the evidence of an accomplice in a crime, when not corroborated by the evidence of some person or persons not implicated in the crime, as to matters material to the issues, that is, matters connecting the defendant with the commission of the crime as charged against him, ought to be received with great caution by the jury before they should convict defendant on such testimony," is full and complete within itself, and no other definition of the word "corroboration" was required.

8. ————: ————: **Evidence.** The testimony of defendant's accomplice in this case is held to be thoroughly corroborated by the testimony of other witnesses.

9. **INSTRUCTION:** After Jury Has Retired: Asked For by One Juror. After the jury have been instructed and have retired to consider of their verdict, any one or more of the jury have the right to ask for further enlightenment and information from the court upon any question involved in the case which they are considering.

10. ————: ————: ————: Mistaken Diagnosis and Wrongful Treatment. Defendant placed morphine in beer and gave it to Robert Harvey to drink and took him to a vacant lot, where he was found next morning in a stupid condition, and some of the physicians at the hospital diagnosed his trouble as alcoholism, but others as morphine poisoning. After the jury had retired to consider of their verdict, one of the jurors sent to the court a note asking if a wrong diagnosis of a disease from which Harvey was suffering and the treatment given him after he was found, based on such erroneous diagnosis, would affect the guilt or innocence of defendant. Thereupon the court instructed the jury in these words: "Answering the inquiry propounded by a juror in this case, which is hereto attached and made a part hereof to the end that this instruction may be more fully understood by the jury, the court further instructs you: That if you find from the evidence, beyond a reasonable doubt, that the defendant willfully and knowingly administered the poison of morphine to Robert Harvey, as in the other instructions defined, and that such morphine was so administered in a quantity sufficient to have brought about or caused the death of said Harvey, then the fact that after the administration thereof he may not, from any cause, have received proper medicinal treatment, or the fact of his having been thus poisoned was not discovered until after his death, will not relieve the defendant from liability in this case, provided the jury be satisfied from

all the evidence, beyond a reasonable doubt, that said Harvey did die as a result of poison so administered." *Held*, that the court's action was proper, and the instruction was correct.

11. **HYPOTHETICAL QUESTION: Modified by Court.** It is not error to strike from the hypothetical question certain statements of fact testified to by another witness when such witness himself modified that statement.

12. ————: ————: **In Favor of Appellant.** And where the expert witness's opinion, notwithstanding such modification, was favorable to defendant, the. defendant has no cause for complaint.

Appeal from St. Louis City Circuit Court.—*Hon. Hugo Muench*, Judge.

AFFIRMED.

*H. H. McCluer, John A. Gernez* and *Thomas W. Ditty* for appellant.

(1)   The court committed error in permitting witness Brown to testify to the movements, actions, conduct and statements of defendant after the commission of the alleged offense.   It was no part of the *res gestae.*   But assuming the competency of the repetition of defendant's admissions   or   statements to Brown, then the court should have given to the jury a cautionary instruction thereon, and its failure so to do is error.   State v. Hendricks, 172 Mo. 669.   (2) The court committed error in admitting the testimony of the witness Hartman as the result of his attempt to make a chemical analysis of the contents of the galvanized bucket given him by Spencer Stewart.   The autopsy was held November 11, 1906; at that time the. body was opened up.   The body was received by the undertaker on the 12th of November, and the viscera placed in a galvanized bucket, not sterilized.   The bucket had been used for washing dead bodies.   After passing from Keeton, the undertaker, to Bergasch and from Bergasch to Fath and from Fath to Stew-

art, it reached witness Hartman on the 14th of November, 1906, at 5:30 p. m.    Where was the body from November 11th to November 12?    It was not accounted for.    State v. Thompson, 132 Mo. 320.    In this case there was no attempt to place the viscera in a clean receptacle, nor were precautions taken to prevent the part reserved for analysis from being tampered with.    Rogers' Exp. Test. (2 Ed.), p. 137; State v. Cook, 17 Kan. 394. Before evidence should have been received as to a chemical analysis, the State should certainly have been required to prove at least the whereabouts of the viscera and body from the day of the autopsy until the day the bucket was turned over to witness.    (3)  The court erred in overruling defendant's motion at the close of the State's case requiring the State to elect upon which count of the indictment it desired to proceed, there being a failure of proof as to the second count of said indictment. The evidence introduced by the State failed to show that deceased came to his death from the effects of an assault, or that an assault in any way contributed thereto.    The court's failure to sustain said motion forced the defendant to introduce unnecessary testimony and to treat said assault as an element contributing to the death of deceased.    The defendant was certainly prejudiced by the court's action.    (4)  The court committed error in failing to define the words "premeditatedly" and "malice aforethought" used in its second instruction.    State v. Sims, 71 Mo. 538; State v. Harris, 76 Mo. 361; State v. Weiners, 60 Mo. 20.    The court committed error in failing to define the words "violent passion" and the words "some lawful or just cause or provocation" used in the same instruction.    State v. Skaggs, 159 Mo. 581; State v. Strong, 153 Mo. 548; State v. Andrews, 76 Mo. 101; State v. Forsythe, 89 Mo. 667; State v. Hickman, 95 Mo. 330; State v. Holloway, 161 Mo. 145; State v.

Reed, 154 Mo. 129. (5) The court committed error in failing to define the word ''corroboration'' used in instruction 10. State v. McLain, 159 Mo. 340; State v. Chyo Chiagk, 92 Mo. 395; State v. Miller, 100 Mo. 606; State v. Hunter, 181 Mo. 338. (6) The court committed error in giving its last instruction in response to a communication sent in by one juror. The instruction as given was not complete or correct under the law and the facts. Additional instructions would have been proper had all the jury asked for them. State v. Miller, 100 Mo. 623.

*Herbert S. Hadley*, Attorney-General, *N. T. Gentry*, Assistant Attorney-General, *Arthur N. Sager* and *C. A. Newton* for the State.

(1) No error was committed by the trial court in permitting State's witness Brown to testify to the movements, action, conduct and statements of the defendant after the commission of the alleged offense. Anything that defendant did or said, either prior to, at the time of, or after the commission of the crime charged, is admissible against him. It tends to show his intent, his motive and the means he resorted to of concealing the crime or avoiding detection. 1 Greenl. on Evid., sec. 214; 2 Wigmore on Evid., sec. 1048; State v. Harris, 150 Mo. 61; Wright & Carson on Crim. Consp., 217; State v. Erwood, 75 Mo. 210; Lynes v. State, 36 Miss. 625; Hunter v. Com., 7 Gratt. 645; People v. Arnold, 46 Mich. 277; State v. Grant, 86 Iowa 228; State v. Robinson, 52 La. Ann. 623; Walls v. State, 125 Ind. 403. (2) Much stress is laid by counsel for the defendant upon the failure of the experts, who testified on behalf of the State, to take proper care of the parts of deceased's body which were submitted to the chemist for analysis. This court can not lay down any iron-clad rule as to the way portions of the body should be cared for. Whether

the parts taken from the body of the deceased and carried in a bucket, delivered to another witness and by him delivered to still another, and whether the same were cared for in a scientific manner, were questions of fact for the jury to pass upon. These witnesses, like all other witnesses, were seen by the jury, and the jury were in a better position than this court to determine whether or not such witnesses were reliable, and correctly stated the facts. If said witnesses told the truth about the way in which the parts of deceased's body were cared for, the places where said parts were kept and the result of the chemical analysis, then there was substantial evidence from which the jury could find that the deceased came to his death by poisoning. (3) Much stress is laid by counsel for the appellant upon the failure to define the terms "wilfully" and "deliberately," which definitions were doubtless inadvertently overlooked by the trial court. In an ordinary case of murder in the first degree, this would be a fatal error, but the case at bar is not an ordinary case of murder in the first degree. Section 1815 makes this murder in the first degree without the elements of premeditation and malice aforethought, so long as the poison was administered "wilfully" and "deliberately" in the perpetration of a robbery. State v. Jennings, 18 Mo. 435; State v. Green, 66 Mo. 648; State v. Hopkirk, 84 Mo. 287; State v. Neuslein, 25 Mo. 111; State v. Green, 66 Mo. 631; State v. Swain, 68 Mo. 605; People v. Vasquez, 49 Cal. 560; State v. Boice, 1 Hous. Crim. Cas. 355; State v. Jones, Ib. 21; State v. Meyers, 99 Mo. 113; State v. Foster, 136 Mo. 655. (4) The argument of defendant's counsel that error was committed in allowing defendant to be tried upon an information which contained two counts, is without merit. At repeated intervals during the trial of the case, the defendant moved the court to require the State to elect

upon which count it would stand. This motion was repeated at the close of the testimony given by Dr. Gradwohl, and the State elected to try on the first count, and the case was submitted to the jury on the first count alone.    (5)    The alleged failure of the trial court to define, by instructions, the words "violent passion," and "some lawful or just cause of provocation," cannot be considered as error. Aside from that, defendant did not specifically save his exceptions to the alleged failure at the time.

BURGESS, J.—On the 12th day of February, 1907, the grand jury of the city of St. Louis returned an indictment against the defendant, charging him with murder in the first degree. The indictment was in two counts, the first of which charged that the defendant gave to one Robert Harvey a large quantity of morphine mixed in a glass of beer, which said beer and morphine the said Harvey drank, and from the effects of which he died. The second count charged that the defendant gave to one Robert Harvey a large quantity of morphine mixed in a glass of beer, which said Harvey drank, and that the defendant then struck, beat, kicked and wounded the said Harvey in the chest and body, inflicting certain mortal wounds and fractures of the ribs, and from the effects of said morphine and wounds so administered the said Harvey died. The defendant was put upon trial on March 22, 1907, and convicted of murder in the first degree under the first count of the indictment. Defendant's motions for a new trial and in arrest of judgment having been overruled, he appealed.

The evidence for the State tended to prove that the defendant was known by two names, Frank Daly and A. C. Biles, and that he resided in the city of St. Louis. The deceased was an engineer, and lived with his family at Osage City, Missouri. For several days prior to the 9th day of November, 1906, the de-

ceased and the defendant had been visiting a saloon known as the Ohio saloon, on the southwest corner of Market and Seventh streets, in St. Louis, and had been drinking considerably.    On the afternoon of said day, the deceased, the defendant and one Joseph Brown were sitting at a table in said saloon, drinking beer, the deceased usually paying for the drinks. A dispute arose between the deceased and the waiter as to whether or not he, the deceased, had paid for three bottles of beer which he had ordered and which had just been brought to the table by the waiter. Having been assured that the beer had not been paid for, the deceased got up from the table, pulled a roll of bills out of his pocket and handed the waiter a five-dollar bill to pay for the beer.    While the deceased was doing this, the defendant and Brown were sitting at the table watching him, and the defendant, when he saw the bills, "nudged" Brown in a significant way, calling his attention to the money.    The deceased returned to the table and sat down, but immediately got up and went to the toilet room.    As soon as he had left the table, the defendant asked Brown for a dime, saying, "I know where I can make a piece of coin."    Brown gave him a dime, and the defendant said, "I will go and get some morph."   He left the saloon and came back in about five minutes. In the meantime the deceased had returned from the toilet room, and was sitting at the table.    The deceased and Brown each poured out a glass of beer from the bottles ordered by the former.    Daly, however, did not do so just then, but took his empty glass and held it under the table, and Brown noticed him making some peculiar motions with his hands as if trying to put something into the glass.    Brown kept talking to the deceased, who did not appear to notice what Daly was doing.    The defendant, while the others were talking, poured beer into this glass and man-

aged to exchange his glass for that of the deceased, who had not yet drunk his glass of beer and whose attention was attracted in a direction away from the table by Brown. The defendant then said, "Here goes," and all three drank. After drinking, the defendant poured the remainder of the contents of his bottle and that of the deceased into one glass, passed it over to the deceased and said, "Drink it up," and the deceased did so. Some more beer was drunk, and all laughed and sang, but the deceased seemed "funnier" than previously and his throat soon got weak. The three men left the saloon, walked south on Seventh street to Clark avenue and turned into an alley, where the deceased, who appeared to be much muddled, sat or fell down. He got up, and again fell down. His companions took hold of his arms, raised him up and walked west on Clark avenue with him as far as Eighth street, where the deceased sat down in a doorway. He appeared to be in a stupor, and acted as if under the influence of an opiate, and had not spoken from the time he left the saloon. The defendant and Brown assisted him to his feet, and the three then went south on Eighth street as far as Spruce street, where there was a vacant lot, into which they went, and there the deceased sat down, his head bent forward. Daly and Brown went out to the street to see if anybody was approaching, and then returned to where deceased was sitting. The defendant then grasped the deceased around the neck and threw him back flat on the ground, put his knee on deceased's neck, and both defendant and Brown went through the pockets of the deceased, the defendant taking all the money of the deceased, and Brown taking two knives and a package of tobacco from deceased's pockets. After robbing the deceased, the defendant stooped down and struck him with something on the breast or stomach, and made the remark to Brown

that "it would keep him from squealing." Before leaving, the defendant picked up a new John D. Stetson black hat worn by the deceased, and both men proceeded to Crouse's pawn shop, where they sold the hat for $1.50. They then went to a saloon and took a drink, and afterwards the defendant divided the booty with Brown, the former stating that he got $4.50 out of deceased's pockets. After boarding a Market, street car, both men began talking about what they had done, and the defendant said, "I gave that son-of-a-bitch enough morphine to kill a man." After defendant and Brown had been arrested, and Brown had confessed and pleaded guilty to the charge against him, the defendant walked by Brown's cell, and, referring to Brown's statement or confession which defendant had read in a newspaper, he said, "You go on up there and go for ninety-nine years; they can't do nothing with you as you got your sentence; you go on there and take it all on you, and I can beat it. I will send you a couple of dollars a week while you are in the penitentiary."

Theodore Young, who ran a drug store at No. 600 Market street, testified that about 6:50 o'clock on the evening of November 9th the defendant visited his drug store and bought ten cents worth of morphine. He was asked by Mr. Young what he wanted to do with it, and the defendant said he was an habitual user of morphine. Mr. Young told him he would have to register his name on the poison register. The defendant gave his name as Frank Daly, and after securing the morphine he left the store.

Joseph Crouse, a pawnbroker at No. 9 South 6th street, testified that the defendant and another man came to his place of business at ten minutes before eight o'clock on the evening of November 9th, and sold him a John D. Stetson hat for $1.50, which hat was identified as the hat worn by the deceased.

210 Sup—43

Officer Butler testified that on the morning of November 10, 1906, at seven o'clock, he found a man on a vacant lot, near the corner of Eighth and Spruce streets; that the man was unable to speak and that his pockets were all turned inside out. Witness said that he appeared to be thoroughly chilled, as "his skin was sort of purple." After taking him to the city hospital, and deceased had been given a bath, witness asked him to give his name, and he said "Harvey," and then said he lived at Osage City, but while witness was asking these questions the deceased did not open his eyes.

Dr. Birdman and Dr. Bevan, of the City Hospital, testified as to the condition of the man when he was brought to the hospital by Officer Butler. The substance of their testimony was that the man was very drowsy and appeared to be suffering from exposure and alcoholism. After receiving a sponge bath, he was examined more thoroughly by Dr. Birdman, who found indications of bronchitis or incipient pneumonia. His pupils were contracted, his breathing labored, and he seemed very tired. The doctor's opinion was that the man was suffering from the effects of alcoholism and exposure. Dr. Bevan then made an examination, and found the man's respiration depressed, his pupils contracted and his condition stuporous, so that it was difficult to rouse him. His symptoms indicated that he had taken whisky and also some powerful toxic product. The doctor felt satisfied that the man was suffering from the effects of morphine particularly, and he gave him a 75th grain of atropine as an antidote for morphine, and the 40th of a grain of strychnine to stimulate the heart. He also found a contusion on his breast, which he pressed, without calling forth any expression or sign of pain, and this fact confirmed the witness in his opinion that the man was under the influence of morphine. His tem-

erature at the time of the examination was 97.6; his pulse beat 60, and his respiration 12, all below normal. Some time after administering these medicines to him, the doctor slapped him on the shoulder and asked him what he had been drinking, and he replied that he drank some whiskey and had been out with a friend named Daly. After resting apparently well, the man died in the hospital a little after one o'clock in the afternoon. The man was identified by his widow and also by his brother-in-law, J. F. Holden, as Robert Harvey, of Osage City.

The body was removed to an undertaking establishment, where the internal organs were removed by the undertaker and placed in a galvanized iro  bucket and a piece of cloth tied over the top. This bucket was given to Harry D. Bergasch, who gave it to Dr. H. W. Fath, at the coroner's office. Dr. Fath gave the bucket to Spencer Stewart, who in turn gave the same to Dr. J. M. Hartman at the morgue. Dr. Hartman testified that he applied the proper tests, and found that the stomach and intestines contained morphine. Dr. Henry J. Scherck and other physicians, in response to hypothetical questions, stated that deceased died from an overdose of morphine. Dr. J. C. Lebrecht, the regular coroner's physician of St. Louis, testified that he made a post-mortem examination of the body of the deceased, and found bruises on the right upper arm and the right mammary region. A further examination disclosed an oblique fracture of the left sixth and seventh ribs. The deceased's kidneys were found enlarged and in a hyperaemic condition, and the left kidney contained pus. The lungs were both congested, and the stomach distended. The heart was normal. It was also in evidence that the deceased was a powerful and vigorous looking man, and weighed between 175 and 200 pounds.

The defendant introduced Dr. R. B. H. Gradwohl,

a physician and bacteriologist, who testified that he had had experience in treating cases of morphine poisoning, uraemia and uraemic poisoning, and kidney diseases.   In response to a hypothetical question, he gave it as his opinion that deceased did not die from morphine poisoning, but that his death was due to alcoholism, uraemia and exposure combined.

The first point urged by the defendant is that the court committed error in permitting Joe Brown, a witness for the State, to testify to the movements, actions, conduct and statements of defendant after the commission of the offense, the ground taken being that such evidence was not admissible because not part of the *res gestae.*   The movements, actions, conduct and voluntary statements of a person charged with a crime, made after the commission of the alleged offense, and which tend to incriminate or connect him with the crime, are always admissible in evidence against him, whether part of the *res gestae* or not.   We are unaware of any exception to this rule.   But defendant contends that, even if properly admitted, the court should have given a cautionary instruction thereon, as the evidence shows that Brown was an accomplice of the defendant in the commission of the offense. There is no merit in this contention, for the record discloses that the court instructed upon that feature of the case.

It is insisted by defendant that Dr. Hartman, who testified as an expert witness on the part of the State, and who subjected the viscera of the deceased to a chemical analysis, was incompetent to testify as such expert because he failed in his preliminary examination and protested against being so denominated. While the witness did not claim to be an expert and protested against being denominated such, we think it was more because of modesty than lack of knowledge respecting the matters to which he testified as

an expert, for he showed himself to be quite familiar with the subject then under consideration, and his testimony bears the stamp of truth and honesty. Besides, the question of whether he possessed the necessary qualifications to render him competent to testify in the character of an expert was a preliminary one to be passed upon by the court after the examination of the witness. [Rogers on Expert Testimony (2 Ed.), sec. 16, p. 39; Hills v. Home Insurance Co., 129 Mass. 345; Chandler v. Jamaica Pond Aqueduct Corp., 125 Mass. 544; Berg v. Spink, 24 Minn. 138; Howard v. Providence, 6 R. I. 516; Ardesco Oil Co. v. Gilson, 63 Pa. St. 146; State v. Arnold, 7 R. I. 586; Krippner v. Biebl, 28 Minn. 139; Steam Towboat Co. v. Starrs, 69 Pa. St. 36.] The weight of the testimony of this witness, like that of any other, was for the consideration of the jury.

It is said for defendant that the State should have accounted for the whereabouts of the stomach and intestines of the deceased from the time of the post-mortem examination by Dr. Lebrecht, for the coroner, on the 11th day of November, 1906, to the afternoon of the 12th day of November next thereafter, when the viscera were removed from the body at the morgue by Keeton, the undertaker and embalmer. Nothing appearing to the contrary, it must be presumed that the body and viscera remained in the care of the keepers of the morgue, where the autopsy was held and the post-mortem examination made, until delivered to the undertaker. There is nothing disclosed by the evidence which could create the slightest suspicion that they were tampered with. Nor does the fact that the viscera was placed by the embalmer in a galvanized bucket, which was not sterilized and which was used in washing dead bodies, indicate that this was wrong or improper. It is clear from the testimony of the witnesses who testified as to the custody of and

manner of keeping the stomach and intestines that there was nothing improper or unseemly about it.

Defendant complains of the failure of the court to define certain words and terms used in the instructions, to-wit, "premeditatedly" and "malice aforethought." If this were an ordinary case of murder in the first degree, the failure of the court to define said words and terms used in the instructions would be reversible error. This, however, falls within that clause of section 1815, Revised Statutes 1899, which provides that "every homicide which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or mayhem, shall be deemed murder in the first degree." In the ordinary case of murder in the first degree, such as may be committed by poison, or by lying in wait, or by any other kind of wilful, deliberate and premeditated killing, malice aforethought and premeditation are constituent elements of the crime, and should be defined, as has been many times held by this court. But where, as in this case, poison is administered, wilfully and deliberately, in the perpetration of a robbery, and death ensues, then such killing, under the provisions of section 1815, supra, is murder in the first degree, and malice aforethought and premeditation are not elements of the offense, and it was, therefore, unnecessary to define those terms. It appears from the evidence that the poison administered to the deceased by the defendant was not for the purpose of killing him, but to enable the defendant to rob him.

In State v. Jennings, 18 Mo. 435, the court gave the jury the following instructions:

"If the jury believe from the evidence that it was not the intention of those concerned in lynching Williard to kill him, but that they did intend to do him great bodily harm, and that in so doing death

ensued, such killing is murder in the first degree, by the statute of this State.''

In passing upon this instruction, the court said: ''The sixth instruction is correct under the statute of this State. . . . . Homicide committed in the attempt to perpetrate any arson, rape, robbery, burglary, or other felony, shall be deemed murder in the first degree.'' That decision was cited with approval in the case of State v. Green, 66 Mo. 648, in which the court also held that wilfulness, deliberation and premeditation, in a case where a person commits murder in the attempt to commit a felony, are not necessary elements of the offense under our statute. [State v. Hopkirk, 84 Mo. 278.]

In State v. Foster, 136 Mo. 653, it is ruled that in an indictment charging murder it is unnecessary to state that the murder was committed in an attempt to rob, but that the indictment may be in common form, and when proof is made that the homicide was committed in the perpetration of a robbery, such proof is tantamount to that premeditation, deliberation, etc., which otherwise are necessary to be proven in order to constitute murder in the first degree. The same rule is announced in State v. Hopkirk, supra; State v. Meyers, 99 Mo. 107, and State v. Donnelly, 130 Mo. 642. It follows that no error was committed by the court in failing to define premeditation and malice aforethought, for if it was not necessary to allege these things in the indictment it was unnecessary to define them. If the poison had been administered with the felonious purpose and intent of killing the deceased, it would be different, because, in that event, malice aforethought and premeditation would be ingredients of the offense; not so, where the poison is administered for the purpose of robbery. As was said in State v. Meyers, supra, upon proof that the crime was committed in the perpetration of the robbery, this

proof answered the ends of the prosecution and stood in the stead of "malice aforethought" and "premeditation."

It is further insisted that the court erred in failing to define the word "corroboration," as used in instruction number 10. This instruction reads as follows:

"The court instructs the jury that the testimony of an accomplice in a crime, that is, a person who actually commits or participates in the crime, is admissible in evidence; yet the evidence of an accomplice in a crime, when not corroborated by some person or persons not implicated in the crime, as to matters material to the issues, that is, matters connecting the defendant with the commission of the crime as charged against him, ought to be received·with great caution by the jury before they should convict the defendant on such testimony."

This instruction is a literal copy of an instruction given upon the same question in State v. Harkins, 100 Mo. 666, and which has been frequently approved by this court since. [State v. Jackson, 106 Mo. 174; State v. Minor, 117 Mo. 302; State v. Crab, 121 Mo. 554; State v. Dawson, 124 Mo. 418; State v. Donnelly, 130 Mo. 642, and subsequent cases.] The instruction is full and complete within itself. Moreover, Brown, the accomplice, was thoroughly corroborated by other witnesses with respect to matters to which he testified directly connecting the defendant with the commission of the crime. Two witnesses, a police officer and a bartender, testified to seeing the deceased, the defendant and Joe Brown in the Ohio saloon, drinking together on the same day the crime was committed. Theodore Young, a druggist, testified to seeing the defendant in his drug store about 6:55 o'clock that evening, and selling him ten cents worth of morphine. Joseph Crouse testified that the defendant, with an-

other man, came to his pawnshop that night and sold him a hat, which hat had been identified as the one worn by the deceased.   Officer Butler testified to finding the deceased in the vacant lot where, as Brown testified, the deceased was left by the defendant and himself the night before.   The testimony of these five witnesses strongly corroborated and dovetailed into Brown's testimony.

After the case was submitted to the jury and they had retired to consider of the verdict, one of their number sent to the court a note asking, in substance, if a wrong diagnosis of the disease from which Robert Harvey was suffering, and the treatment given him at the time and after he was received at the hospital, based on such wrong diagnosis, would affect the guilt or innocence of the defendant under the law. Upon receiving this inquiry, the  court further instructed the jury as follows:

"Answering the inquiry propounded by a juror in this case, which is hereto attached and made a part hereof to the end that this instruction may be more fully understood by the jury, the court further instructs you:   That if you find from the evidence, beyond a reasonable doubt, that the defendant wilfully and knowingly administered the poison of morphine to Robert Harvey, as in the other instructions fully defined, and that such morphine was so administered in a quantity sufficient to have brought about or caused the death of said Harvey, then the fact that after the administration thereof he may not, from any cause, have received proper medicinal treatment, or that the fact of his having been thus poisoned was not discovered prior to his death, will not relieve the defendant from liability in this case, provided the jury be satisfied from all the evidence, beyond a reasonable doubt, that said Harvey did die as a result of poison so administered."

The objection interposed to the giving of said instruction was, and is now, that it was given at the request of one juror, and that it is not complete or correct under the law and the facts. The defendant admits in his brief that additional instructions would have been proper had all the jury asked for them, but contends that as the court had already instructed on the point, the second instruction thereon gave it undue emphasis. There is no merit in these contentions. In the first place, any one or more of the jurors had the right to ask further information and enlightenment from the court upon any question involved in the case which they were considering. In the next place, the instruction was not erroneous, but was a proper explanation of that which the juror desired to know.

It is further said for defendant that the court committed error in striking from the hypothetical question put to Dr. Gradwohl, an expert witness introduced by the defendant, the words "his mind was fairly clear, but his speech was thick and his articulation poor." The words in question were a part of the testimony of Dr. Bevan, one of the physicians at the hospital who examined the deceased before his death and gave him medical attention. The court would not permit this statement to go into the hypothetical question, for the reason that Dr. Bevan had qualified it by other statements and explanations, and the record shows that he did so. For instance, in answer to the question if the patient (the deceased) had become somewhat rational after certain drugs had been administered to him, Dr. Bevan answered, "You cannot say rational, his mind was more active." The expert witness also stated in his testimony that he had heard Dr. Bevan's testimony. In any event, Dr. Gradwohl's answer to the hypothetical question put to him was favorable to the defendant, for his opinion was

that the deceased did not die from morphine poisoning, but that his death was due to alcoholism, uraemia and exposure combined, and it is therefore clear that the defendant has no right whatever to complain.

A final contention is that the evidence is not sufficient to sustain the verdict.    The record discloses no ground for such contention.    Without repeating the evidence, which would serve no useful purpose, we can but say, after a careful consideration thereof, that it leaves no doubt whatever in our minds of defendant's guilt.

Finding no reversible error in the record, we affirm the judgment and direct that the sentence pronounced by the trial court be executed.    All concur.