## STATE v. ROBERT E. PORTH.

(Filed 3 February, 1967.)

**1. Criminal Law § 15—**

A motion for change of venue or, in the alternative, that a jury be summoned from another county, on the ground that defendant could not obtain a fair trial because of widespread and unfavorable publicity, is addressed to the discretion of the trial court, and where the record discloses that the trial judge conducted a hearing, read all the affidavits, and examined the press releases, that each juror selected stated that he could render a verdict uninfluenced by the publicity, and that defendant did not exhaust his peremptory challenges, abuse of discretion in denying the motion is not disclosed.

**2. Indictment and Warrant § 13—**

The denial of a motion for a bill of particulars will not be held for error when the record discloses that defendant's counsel was given copies of documents disclosing the basis of the State's case, and the State introduces no evidence at the trial which could have taken defendant by surprise. G.S. 15-143.

**3. Criminal Law § 43—**

Photographs which are competent for the purpose of illustrating the testimony of the witnesses are not rendered inadmissible because they may be inflammatory or gruesome.

**4. Criminal Law § 53—**

A medical expert may testify from his autopsy, even though the autopsy is made five months after deceased's death, as to the cause of death, the expert having testified that the body was in an excellent state of preservation and quite satisfactory for examination. The delay in making the autopsy relates to the weight of the testimony rather than to its competency.

**5. Homicide § 16—**

The State contended that defendant murdered his wife because he was in love with another woman and his wife would not consent to a divorce. *Held:* Testimony of the woman as to conversations with defendant involving their relationship, defendant's promise of marriage, his report that his wife refused to consent to a divorce, and his remark to the woman, after the body of his wife had been found and before it was identified, that if the body turned out to be that of his wife, "all this is ours", are competent as tending to show motive.

**6. Criminal Law § 76—**

The State contended that defendant murdered his wife because he was in love with another woman and his wife would not consent to a divorce. *Held:* It is competent for the other woman to testify as to the contents of letters written to her by defendant which she had burned, the testimony being competent on the question of motive.

**7. Criminal Law § 165.1— Defendant injecting collateral matter in evidence may not object thereto.**

The body of defendant's wife was found on a mountain side. Medical expert testimony was to the effect that she died from internal and ex-

ternal injuries inflicted by a blunt instrument. Defendant contended that the wounds and abrasions were caused by the wife's fall down a flight of stairs in their home, and that he drove the body of his wife to the mountainside and threw the body out because he was afraid no one would believe his story of accidental death because "of the arsenic case". *Held:* Defendant having injected the question of arsenic poisoning in the case, may not complain that the solicitor pursued the matter in questioning another witness in regard thereto at a time when it appeared that the evidence would be competent on the question of premeditation in the development of the circumstantial case.

**8. Criminal Law § 162— Exculpatory answer of witness held to render improper question harmless.**

The State's evidence tended to show that the body of defendant's wife was found on a mountainside and that she died of internal and external injuries inflicted by a blunt instrument. Defendant contended that his wife died as a result of injuries received in a fall in their home and explained that he drove the body to the mountainside and left it there because of his fear that no one would believe his story of accidental death in view of his wife's prior illness from arsenic poisoning. The solicitor asked defendant's son on cross-examination whether the son did not know that the son's sister had died of arsenic poisoning. *Held:* Even if the question be held improper as injecting the question of defendant's guilt of a separate and independent crime, the witness' categorical denial, being exculpatory, rendered the inquiry harmless.

**9. Criminal Law § 156—**

Instructions which defendant contends the court should, but did not, give should be set forth only in the assignments of error and not incorporated in the record with the charge actually given by the court.

**10. Criminal Law § 162—**

The exclusion of evidence proffered by defendant is not prejudicial when the court later instructs the jury that the evidence was competent and the excluded evidence is admitted and fully considered by the jury.

**11. Criminal Law § 50—**

The State introduced expert testimony that defendant's wife died as a result of multiple external and internal injuries produced by some blunt instrument. *Held:* Testimony of an officer finding the body of the wife on a mountainside that there was definitely no sign to indicate a violent death, is properly excluded as the conclusion of an unqualified witness.

**12. Homicide § 20— Evidence held sufficient to be submitted to jury on issue of defendant's guilt of murder in the first degree.**

The State's evidence tended to show that defendant was in love with another woman, that his wife would not consent to a divorce, that the body of the wife was found on a mountainside, with medical expert testimony that she died as a result of multiple external and internal injuries produced by some blunt instrument. Defendant contended that his wife fell down a four-step stair in the home, resulting in fatal injuries, and that defendant then drove his wife to the mountainside and threw her body out because he was afraid no one would believe that her death

was the result of an accidental fall. *Held:* The circumstantial evidence was sufficient to be submitted to the jury and sustain a conviction of murder in the first degree.

APPEAL by defendant from *Fountain, J.,* February 14, 1966 Criminal Session, FORSYTH Superior Court.

At the September 13, 1965 Session, Forsyth Superior Court, the Grand Jury returned a bill of indictment charging the defendant, Robert E. Porth, with the murder of his wife, Hilda Borchardt Porth. Upon arraignment, the defendant, in person and through counsel of his own selection, entered a plea of not guilty.

On September 23, 1965, the defendant filed a motion that the cause be removed to, or that a jury be drawn from, another county as provided in G.S. 1-84 and G.S. 1-86 on the ground the charge had been given such widespread and such unfavorable publicity that it would be impossible for the defendant to obtain a fair trial in Winston-Salem or before a Forsyth County jury. In support of the motion, the defendant offered 25 affidavits of citizens of the county, among them some members of the Bar, each of whom stated that in his opinion the defendant could not get a fair trial in Forsyth County because of the unfavorable newspaper, television, and radio publicity.

On the other hand, the State filed the affidavits of 25 local citizens, lawyers among them, and called and examined four witnesses in opposition to the motion to remove. Each affiant and each witness expressed the opinion that the defendant could obtain a fair and impartial trial before a local jury.

At the conclusion of the hearing, Judge Shaw made the finding that the defendant could obtain a fair and impartial trial in Forsyth County and denied the motion. After the court's ruling, the defendant filed application for a bill of particulars. The Solicitor filed an answer. The answer alleged that the defendant voluntarily waived a preliminary hearing. The Sheriff's office had furnished defense counsel copies of the investigators' reports and had permitted defense counsel to interview the principal State's witnesses. At the Solicitor's invitation, defense counsel had been present when Dr. Mann, the Medical Examiner of Virginia, discussed the results of his autopsy disclosing his opinion of the cause of Mrs. Porth's death. Dr. Asteinza's report and findings after his autopsy were made available to defense counsel. Judge Shaw denied the petition for the bill of particulars. The defendant excepted.

At the trial beginning on February 14, 1966, the regular jurors summoned for the term and the venire men were examined. Twelve regular and two alternate jurors were accepted as satisfactory both to the State and to the defendant. During the selection the State

exhausted its six peremptory challenges. The defendant exhausted only 12 of his 14 challenges. All other prospective jurors were excused by the court for reasons of age, health, or upon challenges for cause which the court found to be proper.

The State offered evidence tending to show the following: The defendant, 58 years of age, on and prior to August 13, 1965, was employed by Western Electric Company as a missile engineer in its Winston-Salem plant. He and his wife, Hilda Borchardt Porth, were constructing a new home in Winston-Salem. Neighbors saw both at their house on August 13, 1965. At about 5:00 p.m. on that day Mrs. Porth was seen driving her automobile at the Reynolda Manor Shopping Center in Winston-Salem.

On August 14, 1965, at about 7:20 p.m., William Peyton Delp discovered a woman's body a short distance below the road on Draper Mountain, near Pulaski, Virginia. Delp flagged down a passerby who remained at the scene while Delp notified the Police Department of the City of Pulaski. The rescue squad of the police department, the Pulaski County Sheriff's Office, and the Virginia State Police were notified. Dr. Fox, the medical examiner, had the body taken to Radford Hospital for autopsy and pathological examination. The "gross autopsy" by Dr. Fox (apparently superficial) disclosed numerous bruises, contusions and abrasions over the body.

Dr. Asteinza, pathologist at Radford Hospital, performed an autopsy. He described the various evidences of injuries, including fractured ribs, numerous bruises on the body, including a very large and deep bruise at the base of the skull on the left side of the neck. He gave as his opinion that death resulted from brain concussion and shock.

Other evidence at the trial disclosed that the body of Mrs. Porth was prepared for burial and shipped to and interred in Milwaukee, Wisconsin.

About five months after interment, the body was exhumed under court order. Dr. Geoffrey Thomas Mann, Chief Medical Examiner of Virginia, performed an autopsy. Dr. Mann described in detail the extent of the injuries he found. He said the body was in suitable condition for a revealing autopsy. Based on his examination, he gave as his opinion, "She died as a result of multiple external and internal injuries produced by some blunt instrument." Dr. Mann testified the injuries his autopsy disclosed, in his opinion could not have been caused by a fall down a stairway consisting of four steps, 39 inches from top to bottom.

On Monday, August 16, 1965, the defendant called the Virginia Police Headquarters in Richmond and reported his wife missing.

He reported she left Winston-Salem on Friday night, about 9:30, and that she should have arrived in O'Fallon, Illinois, on Sunday but that he had heard nothing from her. The Fourth District Police Headquarters at Wytheville, Virginia, received a call at 1:00 a.m. on August 16, 1965, from one who identified himself as Robert Porth. He said his wife, who was en route to Wisconsin, was missing. He said she left Winston-Salem about 9:30 at night, driving a Chrysler Imperial, North Carolina license No. A R 3509; that she was a good driver, preferred to drive at night during hot weather, but she "had a habit of picking up college students and servicemen who *(sic)* she would see hitch-hiking."

The Virginia State Police contacted Sheriff Shore of Forsyth County. Captain Burton of the Winston-Salem Police Department, and F. B. I. Agent Chandler participated in the investigation. On August 26, Sheriff Shore, Deputy Sheriffs Baker and Speas, and F. B. I. Agent Chandler conferred with Mr. Porth at his office. He stated that he and his wife went to the new house just after 5:00 o'clock on August 13 where he did some wiring and she did some painting. They returned home and at about 9:30 at night she left, in the Chrysler, to drive to Milwaukee, Wisconsin.

On September 6, 1965, Sheriff Shore, Police Captain W. C. Burton, Deputies Speas and Baker, and James Booker, defendant's attorney, pursuant to defendant's request, went to the Porth home where he made a voluntary statement. The more material parts are here quoted:

" 'Something is tearing me up inside,' he said, 'I've got to get it off my chest. I need help.' . . . And at that time Mr. Booker warned him that he didn't have to tell us anything. And he reiterated that two or three times, and Mr. Porth said, 'I know that.' And Mr. Booker asked him if this is what you want to do, and Mr. Porth said, 'It is.' He [defendant] said, 'My friends have turned against me. Those that I thought I could depend on. I have been receiving phone calls calling me a murderer and I can take it no longer.' Said, 'I want to talk about Friday, the 13th of August.' He said, 'You have done a thorough job in your investigation. You have uncovered a lot of skeletons in my closet. I have not been able to sleep. I cannot live with myself. I have made a mess of my life, and I want to straighten things out. I deserve to be punished and you can do whatever you want to with me. You can hang me if you want to.' He said, 'My wife was a fine woman. I have become a professional bum.' He said, 'The arsenic deal is a separate deal and I'll straighten that out later. I want to tell you what happened to my wife.' " * * *

"He said he went down into the Tiki room to get up the paint brushes and tools and clean them up and put them away. The Tiki room is the room on the lower, ground floor.

"And he said that while he was in there he heard a thud out in the hall . . . rushed out . . . found Mrs. Porth lying on the floor with her feet on the steps. . . . she only breathed a couple of times. . . .

" 'I realized there wouldn't be anybody believe me. I knew I was in a hot spot on account of the arsenic case.' " * * *

" 'I got in the Chrysler automobile and backed it into the garage. . . . I put her in the trunk and I drove to the filling station . . . had the car filled up with gas . . .' drove to his house and went in and changed clothes and he called Nancy Johnson in Florida." * * *

"He said he drove up Interstate 52 . . . that he wanted to make it appear that a hitch-hiker had done it. . . . He pulled off the road . . . took the body out, sat it down on the edge of the road and then she rolled down the ravine. 'I drove to Charleston, West Virginia, parked the automobile, caught the plane to Greensboro.' "

The State called and examined Nancy Cockerman Johnson. She stated she had been meeting the defendant secretly for some years. Mrs. Porth found out about the affair. "At some time in February, 1964, the defendant and Mrs. Porth came to my apartment on Polo Road. Mrs. Porth knew that Mr. Porth and I had been seeing each other and she was, of course, mad, and she had learned that I had a ring or something he was supposed to have sent me for my birthday . . . She wanted me to write a note saying that I would not see him anymore." On two occasions when Mrs. Porth was in the hospital the witness admitted she had stayed in the home with the defendant. Defendant told her Mrs. Porth was in the hospital "suffering from arsenic poisoning."

In February, 1965, Mrs. Johnson moved to Florida, "to get a divorce." During her stay in Florida she received many letters from the defendant and talked to him often over the telephone; that on account of the contents of the letters she burned them. He proposed marriage, later said his wife refused to consent to a divorce. In one of his letters, "discussing his wife's illness . . . he said that when dogs . . . are not useful any more they do away with them. In one of our telephone conversations from Fort Lauderdale he stated to me that he was about ready to dig that hole. He said, 'I think you should come up and drive her car up north for me.' "

The witness stated she received a telephone call from Winston-

Salem the night of August 13, around 9:00 o'clock, asking her to come to Winston-Salem. In consequence she met him in Greensboro at the airport on August 14. She remained with him until the investigation of Mrs. Porth's death was transferred from Virginia to Winston-Salem, then she returned to Florida. The testimony both as to the contents of the letters and telephone conversations were admitted over defendant's objections. Exceptions were duly taken.

On cross-examination, Mrs. Johnson admitted she had been treated in hospitals for a nervous breakdown and that she had attempted suicide. The hospital records were offered by the defendant and excluded. They showed a diagnosis "probable schizophrenic reaction." Near the close of the case, however, the Solicitor withdrew his objection and all hospital records were admitted in evidence. During the testimony of Dr. Asteinza defense counsel asked this question:

"In the event and if the jury should find, Doctor, that Mrs. Porth did in fact fall from a height of approximately three to four feet down a flight of stairs beside which there was a brick planter in the immediate vicinity of these steps, would you state whether or not in your opinion the bruises, abrasions and excoriations that you observed on the body of Mrs. Porth could have been produced by a fall down this flight of stairs?"

If permitted, Dr. Asteinza would have answered: "It would have been compatible." Later Judge Fountain concluded the question and answer should have been admitted. Accordingly he addressed an instruction to the jury, repeated the question to them at the time, and stating that he had concluded the evidence was admissible he then permitted the reporter to read what would have been Dr. Asteinza's answer.

At the close of the State's evidence the defendant's motion for a directed verdict was overruled. The defendant called many witnesses who testified he was kind and courteous to Mrs. Porth.

His son, William Porth, testified that in their family discussions his mother would sometimes display temper — his father never. Many witnesses gave the defendant an excellent character. Members of the family and others testified that Mrs. Porth had trouble with her feet and ankles. This was offered to explain the probability of a fall down the steps. The defendant did not testify. His motion to dismiss was renewed at the close of all the evidence and again overruled. The jury returned this verdict: "Guilty of murder in the first degree with recommendation for life imprisonment." From the court's judgment that the defendant be committed to the State's Prison for the term of his natural life, he appealed.

*T. W. Bruton, Attorney General, Andrew A. Vanore, Jr., and Wilson B. Partin, Jr., for the State.*

*White, Crumpler, Powell and Pfefferkorn by Harrell Powell, Jr., William Pfefferkorn and Fred G. Crumpler, Jr., for defendant appellant.*

HIGGINS, J. Before pleading to the indictment the defendant filed a written, duly verified motion requesting, in the alternative, that the cause be removed to, or that a jury be drawn from, another county as contemplated by G.S. 1-84 and G.S. 1-86. In support of the motion the defendant offered 25 affidavits, in each of which a citizen of the county stated that in his opinion, because of the widespread discussion and unfavorable publicity, the defendant could not obtain a fair trial in Forsyth County. The State filed approximately an equal number of affidavits and called four witnesses, each expressing the opinion a fair and impartial jury could be obtained in the county. Judge Shaw conducted a hearing on the motion, read all the affidavits, examined the press releases, and heard the witnesses. At the conclusion of the hearing he found that a fair and impartial jury could be obtained from Forsyth County and denied the motion. The evidence was sufficient to support the finding and called for the exercise of the court's discretion. Failure to exercise the discretion properly is not disclosed. *State v. Childs, ante* 307; *Irvin v. Dowd,* 366 U.S. 717; *Reynolds v. U. S.,* 98 U.S. 145; *State v. McKethan, ante* 81; *State v. Scales,* 242 N.C. 400, 87 S.E. 2d 916; *State v. Culberson,* 228 N.C. 615, 46 S.E. 2d 647; *State v. Lea,* 203 N.C. 13, 164 S.E. 737.

In the actual selection of the jury, the record discloses that 109 veniremen were called and examined under oath, touching their qualifications to serve as jurors. During the examination the State exhausted its six peremptory challenges. The defendant exhausted only 12 of his allotted 14 peremptories. A jury, including two alternates (later excused) was selected. Most of those approved by both parties had read some of the news articles and had heard the case discussed. Each juror selected testified he could hear the evidence, the argument of counsel, and the court's charge and render a verdict thereon uninfluenced by anything he had read or had heard. *State v. Moore,* 258 N.C. 300, 128 S.E. 2d 563.

The defendant assigns as error the court's refusal to require the State to file a bill of particulars. Defense counsel had been furnished copies of the officers' reports, the reports of the autopsies, and had been permitted to interrogate the State's key witness, Nancy Johnson. Defense counsel was present when the defendant made the admissions to Sheriff Shore, his deputies, and Captain Burton. The

State introduced nothing which should have been of surprise to the defendant. The court's refusal to order any additional bill of particulars was not error. G.S. 15-143; *State v. Banks*, 263 N.C. 784, 140 S.E. 2d 318; *State v. Thornton*, 251 N.C. 658, 111 S.E. 2d 901; *State v. Hinton*, 158 N.C. 625, 74 S.E. 104.

During the course of the long trial the defendant entered numerous exceptions to the admission and the exclusion of evidence, both testimony of witnesses and documents. All told, the defendant's brief of 126 pages discusses 57 assignments of error based on 116 exceptions. Obviously, a seriatim discussion would prolong this opinion beyond reasonable bounds. *State v. Lea*, 203 N.C. 13, 164 S.E. 737. The assignments not herein discussed have been examined and have been found to be without merit.

Defendant insists the court should not have admitted for illustrative purposes photographs of the dead body. Two objections were interposed: (1) certain photographs were repetitious; (2) others were inflammatory. Notably, inaccuracy in any particular, is not claimed. Photographs were used to illustrate the testimony of the witnesses with respect to the position and extent of the blood, bruises, and contusions on the body. "If a photograph is relevant and material, the fact that it is gory or gruesome . . . will not alone render it inadmissible." Stansbury on Evidence, § 34, pp. 66-67; *State v. Gardner*, 228 N.C. 567, 46 S.E. 2d 824; *State v. Utley*, 223 N.C. 39, 25 S.E. 2d 195.

Six of defendant's assignments of error involve the evidence of the medical experts as to the cause of death. In particular, the defendant challenges the testimony of Dr. Mann who performed an autopsy in Milwaukee five months after Mrs. Porth's death. Dr. Mann's qualifications were most impressive, fully justified the court's finding of expertness in his field. He testified: "Well, the body was in an excellent state of preservation and quite satisfactory for examination." He found that death resulted from concussion and shock. This evidence was admissible. 3 Underhill, Criminal Evidence, § 632; *State v. Daly*, 210 Mo. 664, 109 S.W. 53; *Kemp v. State*, 179 So. 2d 762, 278 Ala. 637; *Tarkaney v. Commonwealth*, 240 Ky. 790, 43 S.W. 2d 34; *Williams v. State*, 64 Md. 384, 1 A. 887. The delay in making the autopsy related to the weight rather than to the competency of Dr. Mann's evidence.

Two assignments of error challenge the testimony of Nancy Johnson, "the other woman" in the case. Mrs. Johnson testified to an association with the defendant for a number of years. She detailed many conversations, some by telephone. These involved their relationships, the defendant's promise of marriage, and his report later that his wife refused to consent to a divorce. The defendant

admitted to Sheriff Shore that he called Nancy Johnson in Florida just before he started on the trip north to dispose of his wife's body which was then concealed in the trunk of his automobile.

While the defendant and the witness were in the new home after the body was found in Virginia and before it was identified, the defendant remarked to Nancy Johnson that if the body turned out to be his wife, "(A)ll this is ours." This evidence was competent on the question of motive. *State v. Smoak,* 213 N.C. 79, 195 S.E. 72. The testimony as to the contents of the burned letters was competent. *State v. Neville,* 157 N.C. 591, 72 S.E. 798; *State v. Ferguson,* 107 N.C. 841, 12 S.E. 574. Mrs. Johnson properly identified the author of the letters and testified she burned them. *State v. Wilkerson,* 98 N.C. 696, 3 S.E. 683; *State v. Credle,* 91 N.C. 640.

". . . (T)he declarations, statements, and admissions of a defendant of facts pertinent to the issue, and tending, in connection with other facts, to prove his guilt of the offense charged, are competent against him in a criminal action." *State v. Woolard,* 260 N.C. 133, 132 S.E. 2d 364; *State v. Ragland,* 227 N.C. 162, 41 S.E. 2d 285; *State v. Abernethy,* 220 N.C. 226, 17 S.E. 2d 25; Wharton's Criminal Law, 12th Ed., Vol. 2, § 400.

Assignments of Errors Nos. 17, 30, 39, 43, and 64 relate to the evidence of "another crime" — arsenic poisoning. The first time this subject came into the evidence was by the testimony of Sheriff Shore quoted in the statement of facts. The defendant called the officers and told them Mrs. Porth fell down the steps and sustained fatal injuries; that he became panicky, realizing no one would believe the story because of the skeletons in his closet. In his panic he disposed of the body in such manner as to indicate a hitch-hiker had murdered her. In this conversation he said, "The arsenic deal is a separate deal and I will straighten it out later."

Nancy Johnson testified Mrs. Porth found out that her husband and the witness had been seeing each other while she was in the hospital. Mrs. Porth accused both of being responsible for her illness. The Solicitor asked Mrs. Johnson whether the defendant had ever told her "what she (Mrs. Porth) was suffering from." Her answer was, "Yes — arsenic poisoning."

One of the assignments of error involved a question addressed to William Porth, son of, and witness for, the defendant. He had testified that he came home from Alaska for his sister's funeral in 1962. The solicitor's question: "Don't you know for a fact that your sister died from arsenic poisoning?" Answer: "No, sir, I don't." He was asked whether the family did not discuss arsenic poisoning. He said arsenic was never mentioned. The question and the answer were admitted over the defendant's objection. As bearing on the

objection, it should be remembered that the defendant first brought up the "arsenic deal" as one of the skeletons in his closet. This was one of the reasons he assigned for his panic and his realization no one would believe that his wife had been killed by the fall down the steps. Nancy Johnson had quoted the defendant as saying Mrs. Porth was in the hospital because of arsenic poisoning. These clues alone were sufficient to justify the solicitor's efforts to find out if an attempt had been made to take Mrs. Porth's life by poisoning. Such efforts, if attributable to the defendant, would have obvious bearing on the question of premeditation. *State v. Faust,* 254 N.C. 101, 118 S.E. 2d 769; *certiorari* denied, 368 U.S. 851. However, the solicitor's effort to show by cross-examination of William Porth that his sister died as a result of arsenic poisoning was not warranted. The court should have sustained the objection. There was nothing to show the daughter, at the time of her death, was a member of the defendant's household, or that by mistake she took arsenic poisoning which the defendant had intended for Mrs. Porth.

Absent a showing that the death of witness Porth's sister was caused by arsenic poisoning which was intended, not for her, but for her mother, the inquiry into the cause of the sister's death would appear to be improper as introducing evidence of a separate and independent crime. The rule, and the exceptions with respect to such evidence are fully discussed in *State v. McClain,* 240 N.C. 171, 81 S.E. 2d 364. The question may be debatable whether the evidence of the sister's death by poisoning is governed by the general rule and should be excluded, or by the exceptions, and should be admitted. But assuming the question was improper, nevertheless, the answer was exculpatory and rendered the inquiry harmless.

The full context of the court's charge as disclosed by the record contains not only what the court actually charged but the defendant has embodied therein the contention as to what the court should have charged. The contention should be set forth only in the assignment of error.

The alleged error based on the court's refusal to permit Dr. Asteinza to testify that in his opinion the injuries he found on the body of Mrs. Porth could have been caused by a fall was cured by the court's instruction that the evidence in his opinion was competent, and was then admitted and fully considered by the jury. Likewise, the solicitor withdrew his objection to the admissibility of the hospital records showing that Nancy Johnson had been in the hospital on several occasions and her condition diagnosed as schizophrenic. These records were before the jury as Exhibits Nos. 46 and 47.

State Trooper Dowdy, the first officer to view the body on the

mountain, on cross-examination was asked if he did not make a report of the case. He testified he made a report to the Judge and the Commonwealth Attorney. This report was not required. He was then asked what was included in the report as the cause of death. The court sustained the State's objection. If permitted the officer would have testified: "There definitely were no signs to indicate a violent death." He had testified to bruises apparent on the body but only an autopsy by a medical expert could determine the cause of death. Mr. Dowdy testified as to bruises and contusions he observed. This did not qualify him to testify as an expert witness and tell the jury, "There definitely were no signs to indicate a violent death." The court properly sustained the objection as the conclusion of an unqualified witness. State v. Arnold, 258 N.C. 563, 129 S.E. 2d 229; State v. Mays, 225 N.C. 486, 35 S.E. 2d 494.

We have given careful consideration to the defendant's assignments of error based on the court's refusal to dismiss at the close of all the evidence. Without reciting the details of the evidence, it discloses that Mrs. Porth died in the new home when no one but the defendant was with her. He claimed her injuries resulted from the fall. The medical testimony discloses that she died of concussion and shock. He told Sheriff Shore that he became panicky because of the other woman and the arsenic poisoning, concluded that no one would believe his story. For this reason, he stuffed the body in the trunk of his automobile and drove that night to Pulaski County, Virginia, where he placed the body by the side of the road and permitted it to roll down the side of Draper Mountain. Before he left, however, he called the "other woman" in Florida and invited her to come at once. She met him at the airport in Greensboro the following night. Apparently they lived together in and around Winston-Salem until the investigation began there. She then went back to Florida.

The evidence before the court and jury was sufficient to furnish ample support for a conviction of murder in the first degree. Present was one of the strongest motives inducing a man to do away with his wife — the other woman. The manner by which that objective was accomplished in this case shows premeditation, deliberation, the formation of a fixed purpose and design to kill, and a felonious execution of the design. The facts and circumstances in evidence clearly and from every angle point an accusing finger at the defendant. State v. Battle, 267 N.C. 513, 148 S.E. 2d 599; State v. Bridgers, 267 N.C. 121, 147 S.E. 2d 555; State v. Roux, 266 N.C. 555, 146 S.E. 2d 654; State v. Moore, 262 N.C. 431, 137 S.E. 2d 812; State v. Stephens, 244 N.C. 380, 93 S.E. 2d 431.

Painstaking examination of the court's charge fails to disclose any error. When considered in its entirety, the instructions given the

jury cover clearly, accurately and impartially all essential features of the case. In the verdict and judgment, we find
    No error.