STATE OF NORTH CAROLINA v. DEE D. ATKINSON

No. 22

(Filed 14 May 1969)

**1. Criminal Law § 154—, service of case on appeal — extension of time**

Only the judge who tried the case can extend the time for serving the statement of the case on appeal, and, having granted one extension, he may not grant another after the expiration of the term at which the judgment was entered.. G.S. 1-282.

**2. Criminal Law § 154— failure to serve case on appeal within authorized time — appellate review**

Where the appellant's statement of the case on appeal is not served within the time fixed by statute or within the period of an authorized extension by the trial judge, the Supreme Court is normally limited to a consideration of the record proper, and if no error appears on the face thereof, the judgment will be affirmed.

**3. Criminal Law § 154— case on appeal — duty of appellant**

It is the duty of the appellant to see that the record is properly made up and transmitted to the appellate court.

**4. Criminal Law § 154— invalid extensions of time to serve case on appeal**

Where defendant gave notice of appeal to the Supreme Court on the

day judgment was pronounced in the superior court and the presiding judge then extended the time for serving the case on appeal to 60 days, two subsequent orders entered by the trial judge after the expiration of the term at which the judgment was pronounced and a subsequent order entered by another judge undertaking further to extend the time for the service of the statement of the case on appeal were nullities.

**5. Criminal Law § 153— jurisdiction of trial court after appeal taken**

After an appeal is taken, the court from which it is taken has no authority with reference to the appellate procedure except that specifically conferred upon it by statute.

**6. Criminal Law § 154— extensions of time to serve case on appeal — certiorari**

Extensions of time to serve the statement of case on appeal in addition to that allowed by G.S. 1-282 may be obtained only by petition for *certiorari* directed to the court to which the appeal has been taken.

**7. Criminal Law §§ 154, 156— failure to serve case on appeal in apt time — appeal treated as petition for certiorari**

In this purported appeal from a judgment imposing the death sentence for the crime of first degree murder, where no statement of case on appeal was served within the time allowed by valid order, the Supreme Court upon its own motion treats the appeal as a petition for *certiorari*, allows the same and considers all assignments of error upon their merits as if the case on appeal had been served within the time properly allowed therefor.

**8. Constitutional Law § 29; Criminal Law § 135; Jury § 7— exclusion of veniremen opposed to capital punishment**

Prior to the decision of *Witherspoon v. Illinois*, 391 U.S. 510, it was not error under the law of this State to allow challenges for cause by the State to prospective jurors who stated they had "conscientious scruples against the infliction of the death penalty" in a case where such penalty might be inflicted pursuant to a verdict of guilty.

**9. Constitutional Law § 29; Criminal Law § 135; Jury § 7— application of Witherspoon v. Illinois to this State**

The Constitution of the United States, as interpreted by the Supreme Court of the United States in the *Witherspoon* decision, is controlling insofar as it conflicts with the law of this State.

**10. Constitutional Law § 29; Criminal Law § 135; Jury § 7— death penalty — exclusion of veniremen opposed to capital punishment**

Under the decision of *Witherspoon v. Illinois*, 391 U.S. 510, a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.

**11. Homicide § 29— instructions — discretion of jury to recommend life imprisonment**

In a prosecution for first degree murder, the trial court must instruct

the jury that it might, in its unbridled discretion, render a verdict of guilty with a recommendation that the punishment be imprisonment for life, which would then be binding upon the court in the matter of sentence. G.S. 14-17.

**12. Homicide § 31; Criminal Law § 135— death penalty — unanimity of jury verdict**

In a prosecution for first degree murder, if one juror refuses to consent to a verdict of guilty of murder in the first degree without a recommendation that the punishment be imprisonment for life, the death sentence cannot be imposed on the defendant, since the verdict of a jury must be unanimous.

**13. Constitutional Law § 29; Criminal Law § 135; Jury § 7— exclusion of venireman who would never return verdict requiring death penalty**

In this prosecution for the capital crime of first degree murder, the Constitution of the United States, as interpreted in *Witherspoon v. Illinois,* 391 U.S. 510, is not violated by the allowance of the State's challenges for cause of prospective jurors who made it clear on *voir dire* examination that, before hearing any of the evidence, each of them had already made up his mind that he would not return a verdict pursuant to which the defendant might lawfully be executed, whatever the evidence might be.

**14. Constitutional Law § 29; Jury § 5— right of State to unbiased jury**

The State, as well as the defendant, is entitled to a jury which will give it a fair and impartial verdict upon every issue properly presented by the evidence, including the question of whether, upon the evidence, a defendant believed by them beyond any reasonable doubt to be guilty of first degree murder should be executed or should be imprisoned for life.

**15. Constitutional Law § 29; Jury § 7— statement in record relating to examination of prospective jurors as to views on capital punishment**

In this appeal from a judgment imposing the death sentence, a statement in the record, following the recital of the *voir dire* examination of three prospective jurors relating to their views on capital punishment and the rulings of the court sustaining the State's challenges to them, to the effect that all 50 prospective jurors called to the stand were asked similar questions concerning capital punishment *is held* not to disclose any violation of defendant's constitutional rights, the statement showing only that 36 prospective jurors were excused since 14 jurors were chosen, but the record failing to show how many of the 36 were challenged by the State for cause or that any successful challenge for cause, other than the three set forth in the record, was based on the answer of the prospective juror with reference to capital punishment.

**16. Jury §§ 6, 7— examination with respect to views on capital punishment**

Even if a prospective juror's answer to a question relating to his views on capital punishment is not sufficient to support a challenge for cause,

the solicitor may properly ask the question in order to permit the intelligent use of the peremptory challenges allowed by law to the State.

**17. Jury § 7—   challenge for cause — desire of juror to affirm**

The desire of a prospective juror to affirm rather than take an oath is not, of itself, cause for challenge in this State. G.S. 9-14, G.S. 11-11.

**18. Jury § 7—   erroneous allowance of challenge for cause**

Nothing else appearing, the erroneous allowance of an improper challenge for cause does not entitle the adverse party to a new trial, so long as only those who are competent and qualified to serve are actually empaneled upon the jury, especially where the adverse party does not exhaust his peremptory challenges.

**19. Constitutional Law § 29;   Jury § 5—   right to jury chosen without unconstitutional discrimination**

Defendant is not entitled to a jury of his selection or choice but only to a jury selected pursuant to law and without unconstitutional discrimination against a class or substantial group of the community from which the jury panel is drawn.

**20. Constitutional Law § 29;   Jury § 5—   discretion of court to excuse juror not challenged by either party**

It is the right and duty of the court to see that a competent, fair and impartial jury is empaneled and, to that end, the court in its discretion may excuse a prospective juror without a challenge by either party and as a result of information voluntarily disclosed by the prospective juror without questioning.

**21. Constitutional Law § 29;   Jury § 5—   waiver of irregularity in forming jury**

An irregularity in forming a jury is waived by silence of a party at the time of the court's action.

**22. Constitutional Law § 29;   Jury § 5—   jury drawn from cross section of community — excusal of jurors who refused to take oath**

In this prosecution for first degree murder, defendant was not deprived of a jury drawn from a cross section of the community when the trial court in its discretion and on its own motion excused three prospective jurors who refused to take the customary oath for jurors, defendant having failed to show that persons who have conscientious scruples against taking an oath constitute any substantial portion of the prospective jurors of the county of defendant's trial or that jurors without such scruples would be less inclined than others to convict or to impose the death penalty, and defendant having failed to object to the court's action until after the verdict was rendered.

**23. Constitutional Law § 29;   Jury § 5—   group discrimination in jury selection — burden of proof**

A defendant complaining of group discrimination in the selection of the jury which tried him has the burden of proving that the jury selected did not represent a fair cross section of the entire community.

**24. Criminal Law § 42— admission of bloodstained clothing**

In this prosecution for the first degree murder of a child, the court properly admitted articles of bloodstained clothing and a bloodstained washcloth found on the body of the deceased child, such evidence being competent to identify the body, to corroborate the State's theory of the case, and to enable the jury to realize more completely the cogency and force of the testimony of the witnesses.

**25. Criminal Law § 43— admissibility of gruesome photographs**

The fact that a photograph depicts a horrible, gruesome and revolting scene indicating a vicious, calculated act of cruelty, malice or lust does not render the photograph incompetent in evidence when properly authenticated as a correct portrayal of conditions observed and related by the witness who uses the photograph to illustrate his testimony.

**26. Criminal Law § 43— admissibility of photographs**

Ordinarily, photographs are competent to be used by a witness to explain or illustrate anything it is competent for him to describe in words.

**27. Criminal Law § 43— color photographs**

The fact that photographs are in color does not affect their admissibility.

**28. Criminal Law § 43; Homicide § 20— photographs of body**

In a prosecution for homicide, photographs showing the condition of the body when found, the location where found and the surrounding conditions at the time the body was found are not rendered incompetent by their portrayal of the gruesome spectacle and horrifying events which the witness testifies they accurately portray.

**29. Criminal Law § 43— identification of photographs**

It is not necessary that the photograph be taken by the witness if the witness testifies that it correctly represents what he observed.

**30. Criminal Law § 43; Homicide § 20— photograph of body of deceased after moved from place where found**

A photograph of the body of the deceased is not rendered inadmissible by the fact that it was taken after the body had been moved from the place where originally found to the morgue or other place for examination.

**31. Criminal Law § 43— photograph showing condition of body at time after homicide occurred**

The fact that a photograph was taken and portrays the condition of the body at some time after the homicide occurred does not, of itself, render the photograph incompetent.

**32. Criminal Law § 43; Homicide § 20— homicide prosecution — admissibility of photographs of body and location**

In this prosecution for the first degree murder of a child, the court did not err in the admission of photographs used by witnesses of the State to illustrate their testimony concerning the location and appearance of the place where the child's body was found buried and the condition of

the body, where the court instructed the jury that the photographs were allowed in evidence for the sole purpose of illustrating the testimony of the witnesses and not as substantive evidence.

**33. Criminal Law § 42— homicide prosecution — shovel used to dig grave of victim**

In this prosecution for the first degree murder of a child, the court did not err in the admission of a shovel taken from defendant's home with his permission after defendant admitted having used the shovel to dig the grave where the child's body was found.

**34. Criminal Law § 34— evidence of other crimes**

While evidence of other crimes having no bearing upon the crime for which the defendant is on trial may not be introduced prior to his taking the stand as a witness, all facts relevant to the proof of defendant's guilt of the crime charged may be shown by evidence, otherwise competent, even though that evidence necessarily indicates the commission by him of another criminal offense.

**35. Criminal Law § 34— evidence of other crimes**

Evidence of other offenses is competent to show the crime charged was committed for the purpose of concealing another crime, to show a motive on the part of the accused to commit the crime charged, to show the *quo animo*, intent, design, guilty knowledge, or scienter, to make out the *res gestæ*, or to exhibit a chain of circumstances in respect of the matter on trial, when such crimes are so connected with the offense charged as to throw light upon one or more of these questions.

**36. Criminal Law § 34— homicide prosecution — evidence of rape**

In this prosecution for the first degree murder of a female child, the court properly allowed a pathologist for the State to testify as to the conditions he observed upon the child's body and his conclusion therefrom that she had been raped, and to use properly authenticated photographs to illustrate his testimony, such evidence being competent to establish the motive, premeditation, deliberation and malice on the part of defendant for and in the murder with which he was charged.

**37. Criminal Law § 5— test of insanity as defense of crime**

The test of insanity as a defense to an alleged criminal offense is the capacity of the defendant to distinguish between right and wrong at the time of and in respect of the matter under investigation.

**38. Criminal Law § 5— defense of insanity — competency of evidence**

Evidence tending to show the mental condition of the accused both before and after the commission of the act is competent provided it bears such relation to the defendant's condition of mind at the time of the alleged crime as to be worthy of consideration in respect thereto.

**39. Criminal Law §§ 5, 53— expert testimony as to defendant's mental condition on date of crime**

In this prosecution for first degree murder, the court properly allowed a psychiatrist for the State who examined and observed defendant over

a substantial period of time pursuant to a court order entered some three and a half months after the alleged offense to testify that he was of the opinion that defendant "knew right from wrong" on the date of the alleged offense.

**40. Criminal Law § 5— defense of insanity — burden of proof**

Defendant has the burden of establishing the defense of insanity to the satisfaction of the jury.

**41. Criminal Law § 99— comment by trial court during solicitor's argument**

Where defendant objected to a statement in the solicitor's argument to the jury that "defendant's mother said that she didn't remember whether she was charged with killing her first husband or not," a comment by the court that "I remember distinctly that she said it," although not supported by the narrative summary of testimony of defendant's mother in the record, did not constitute an expression of opinion as to the credibility of the witness and was not prejudicial error since defendant's mother had admitted her conviction of the murder of her second husband.

**42. Criminal Law § 159— case on appeal — statement of evidence**

It is not required that the appellant set forth in his statement of the case on appeal the evidence in its entirety.

**43. Criminal Law § 161— appeal is exception to judgment**

Defendant's appeal is itself an exception to the judgment and brings up for review all matters appearing on the face of the record proper, including the sufficiency of the verdict to support the imposition of the death sentence.

**44. Constitutional Law § 29; Criminal Law § 135; Homicide § 31— sentence for first degree murder — G.S. 14-17, former G.S. 15-162.1**

G.S. 14-17, providing for the sentence to be imposed for first degree murder upon a verdict returned by the jury, and G.S. 15-162.1, which prior to its repeal by the 1969 Legislature provided for the sentence to be imposed upon an accepted plea of guilty, were separate and distinct statutes; therefore, the validity of G.S. 14-17 cannot be adversely affected by the invalidity, if any, of [former] G.S. 15-162.1.

**45. Constitutional Law § 29; Criminal Law § 135; Homicide § 31— capital punishment for first degree murder — jury verdict — U. S. v. Jackson**

The decision of *United States v. Jackson*, 390 U.S. 570, did not at the time of defendant's trial prior to the repeal of G.S. 15-162.1 and does not now forbid the courts of this State to impose the sentence of death pursuant to a verdict of the jury in accordance with G.S. 14-17.

**46. Constitutional Law § 29; Criminal Law § 135; Homicide § 31— right to jury trial — life sentence upon guilty plea — former G.S. 15-162.1**

In this prosecution for first degree murder, [former] G.S. 15-162.1, which at the time of the trial permitted a defendant represented by

STATE *v.* ATKINSON

counsel to tender a written plea of guilty to a charge of first degree murder which, if accepted by the State and approved by the court, had the effect of a jury verdict of guilty with a recommendation of life imprisonment, did not discourage defendant from exercising his constitutional right to trial by jury where defendant entered a plea of not guilty and was tried by a jury.

**47. Constitutional Law § 29;   Criminal Law § 135;   Homicide § 31— constitutionality of death penalty**

The imposition of the death penalty for first degree murder is not unconstitutional *per se.*

**48. Criminal Law § 135;   Homicide § 31—   death penalty for first degree murder**

The imposition of the death penalty for first degree murder is expressly authorized by Article XI, § 2, of the Constitution of North Carolina.

**49. Criminal Law § 135;   Homicide § 31—   death penalty for first degree murder**

The Fourteenth Amendment to the United States Constitution does not prevent the State of North Carolina from sentencing a defendant to death pursuant to G.S. 14-17.

**50. Criminal Law § 135;   Homicide § 31—   death penalty for first degree murder — determination by Legislature**

It is for the Legislature, not the courts, to determine whether the provision imposing the death penalty for the commission of first degree murder is or is not a wise policy for this State.

**51. Criminal Law § 146—   appellate review of capital case**

In capital cases the Supreme Court will review the record and take cognizance of prejudicial error *ex mero motu.*

HIGGINS, J., concurring.

BOBBITT, J., dissenting as to death sentence.

SHARP, J., joins in dissenting opinion.

APPEAL by defendant from *Parker, J.,* at the July-August 1968 Criminal Session of WAYNE.

The defendant appeals from a judgment sentencing him to death, the jury having found him guilty of murder in the first degree and having made no recommendation that his punishment be imprisonment for life. The defendant entered a general plea of "not guilty" and further pleas of "not guilty" on the grounds of insanity and of "temporary or transitory insanity at the time of the alleged commitment of the act." The indictment, verdict and judgment were all proper in form.

The regular panel of jurors having been exhausted, additional prospective jurors were summoned. The record discloses no defect in or objection to the procedure followed in so doing. Neither the State nor the defendant exhausted available peremptory challenges. There is no suggestion in the record that any member of the jury which rendered the verdict was not competent.

The following is a summary of the evidence introduced by the State:

Catherine (Kathy) Carr, age four years, was living in Smithfield, Johnston County, with her maternal grandmother on 16 December 1967. The defendant was her stepfather. He lived near Smithfield, separate and apart from the child's mother, who lived in Durham. Prior to the separation they had all lived together at the defendant's home near Smithfield, the defendant demonstrating normal affection for Kathy.

At approximately 5 p.m. on 16 December 1967, the defendant drove his station wagon to the home of the grandmother and told her that he wanted to take Kathy to see her mother in Durham. They located Kathy at the home of a neighbor, picked her up and returned to the grandmother's home, where the grandmother assembled a change of clothing for the child. The State introduced in evidence various articles of clothing after the grandmother identified each as either worn or carried by Kathy when she left the grandmother's home in the company of the defendant at approximately 6 p.m.

The grandmother, an experienced hospital nurse's aid, who had worked with mental patients, observed nothing unusual about the defendant while she was with him when he so came to get Kathy. He then appeared to her to be "normal."

At 9:45 p.m., the defendant drove up to and entered a restaurant in Smithfield. His clothing was disarranged. He went to the rest room and remained there about five minutes. When he emerged therefrom with some adjustment of his appearance, he purchased a coca cola, drank some of it, went out to his station wagon, opened the door to it, returned to the restaurant and announced that someone had kidnapped his child. He made conflicting statements as to where the child had been in the vehicle. At that time the defendant "acted normal" in the opinion of a police officer who was in the restaurant. Spots of blood were observed in the vehicle.

Investigating officers warned the defendant of his constitutional rights. (On voir dire examination, an officer testified that the full

*Miranda* warning was given to the defendant, the defendant stated he would talk to the officers "without a lawyer being present," and there were no threats or inducements made or given the defendant in order to elicit a statement. The court found as a fact that any statement made to such officers by the defendant was "made freely, understandingly and voluntarily after full and complete warning of all rights guaranteed to said defendant under the State and Federal Constitution, without threat, promise of reward, coercion, duress or any other undue influence.") Thereafter, on 17 December, the defendant drew and gave to the investigating officers a map, showing the location of the place where Kathy's body was buried. This map was introduced in evidence. At that time the officers did not know where the child or her body was.

Using the map or diagram so prepared by the defendant, the officers, together with the defendant, then drove to a point on a rural road in Wayne County, 18 miles from the defendant's home, from which point they walked 75 yards into a pine woods. There the defendant pointed to a spot and told the officers the child's body was buried there. The diagram, so prepared by the defendant, was an accurate portrayal of the route from Smithfield to this point. An abundance of pine needles on the surface at the place so indicated by the defendant made the area compatible in appearance with the surrounding area so that a passerby would not have recognized this as a grave. Kathy's body was found two feet below the surface at this point.

Photographs of the area, the opened grave and the child's body and articles of clothing in the grave were introduced in evidence and used by an investigating officer to illustrate his testimony, each photograph being duly identified as to its accuracy. Other photographs of the child's body, properly identified and authenticated, were introduced in evidence and used by the State's witnesses to illustrate the condition of the body, wounds thereon, the condition of the clothing and profuse blood stains thereon. The articles of clothing, previously identified by the child's grandmother, were identified by the investigating officers as being upon the body or otherwise in the grave when the body was discovered. The court instructed the jury at the time the photographs were offered in evidence that they were not substantive evidence but were allowed only for use to illustrate the testimony of the witnesses, if the jury found they did so illustrate such testimony.

The State also offered in evidence a shovel found at the defendant's home and taken therefrom by the officers with the defendant's

permission on 18 December, immediately after Kathy's body was removed from the burial place. The shovel then had upon it soil of the same type as the soil in the shallow grave.

On 18 December (having been given again the full *Miranda* warning concerning his constitutional rights), the defendant made a detailed statement to the officers concerning the events of the afternoon and evening of 16 December. At the time of making the statement, he did not appear "to be in a highly nervous condition." The officer to whom the statement was made testified that the defendant then told the officer that he left the grandmother's residence with Kathy in his car and took her to his own residence, where they were alone. He then undressed the child and had intercourse with her despite her screams and struggles. Using a washcloth (such bloody cloth having been found upon the child's body upon her removal from the grave), he cleaned the blood from her person and dressed her. He then got his shovel, placed it in the station wagon, led Kathy out and put her in the station wagon, drove with her to the place where her body was found buried (18 miles from his residence), took the shovel, proceeded into the woods, dug the grave, went back to the station wagon and "led Kathy Carr by the hand" to the grave, where he "took his hands and choked her to death." He then placed her in the grave and covered her, spreading pine needles over the grave so it would be "hard to recognize," drove back to Smithfield, went into the restaurant, went back out to his car, returned to the restaurant and told the people Kathy had been left in the car and was "gone."

On 19 December, Kathy's body was examined by an expert in pathology, who testified as such. This witness testified that in his opinion the child "had suffocated to death as the result of being strangled or the hand or some other object being placed over the mouth and nose." He further testified that in his opinion, based upon his examination of her body, her vaginal tract had been penetrated by a male organ and had been severely lacerated and torn in the process, using photographs above mentioned to illustrate his testimony. (The court again instructed the jury that the photographs were allowed in evidence for no purpose other than that of illustrating the testimony of the witness, they not being substantive evidence.) This witness also identified certain articles of clothing and the washcloth, previously introduced in evidence by the State, as having been found upon Kathy's body by him at the time of his examination on the morning of 19 December, and stated that their condition at the time he saw them in the courtroom was the same as at the time of his examination of the child's body. He testified

that in his opinion the blood on the washcloth came from the above mentioned "tear or laceration" of the body of Kathy Carr.

The following is a summary of the evidence introduced by the defendant:

The defendant testified to the effect that he was 27 years of age and had served a term in prison for armed robbery prior to his marriage to Kathy's mother. Upon his release from prison he "felt depressed and worried." He separated from Kathy's mother about six weeks prior to Kathy's death. He then "was becoming worried, depressed and moody" and "felt like" he was losing his "grip mentally as well as physically." He loved Kathy. When he took Kathy from her grandmother's home on 16 December, he "was feeling very depressed, very worried and up-set over the situation" between him and his wife. Leaving the grandmother's home with Kathy, he took her to his home where he decided to give her a bath before taking her to her mother. Kathy then asked him when she and her mother could come back to live with him. He replied that he did not know if they could or not. She kept asking him and he "yelled at her and told her to hush." She began to cry and he spanked her lightly. She cried harder and he "went out of [his] mind." He does not remember what happened from then until he found himself back in his home, except for "impressions, flash glimpses of what happened" or what he thinks happened in those two hours. He drew the map above mentioned showing the location where he thought Kathy was buried. He took the officers to the grave but does not "remember clearly" that he actually buried Kathy. He did not spank her hard enough to make her bleed. He did not tell the officer that he raped Kathy.

The defendant's mother testified that when he came out of prison he was "very nervous" and, in May, 1967, "he seemed to be in a worried and troubled state of mind." On his last visit to his mother, prior to 16 December 1967, "he appeared to be in a very, very nervous state." In her opinion, on 16 December "he was incapable of distinguishing between right and wrong in relation to the charge of murder" and he did not know right from wrong at the time she was testifying. She, herself, was convicted and served a sentence for the murder of her second husband. (The defendant's father was her first husband.)

Other witnesses for the defendant testified that he was "good" to Kathy, "his character and reputation was very good" and he was a good worker on his job. Several of these witnesses, including relatives of the defendant, testified that they observed no indication of insanity in his conduct. One of them, the defendant's parole officer

from the time of his release from prison on the sentence of armed robbery until approximately two months prior to 16 December 1967, testified that in his opinion the defendant "knew right from wrong" when he came under the supervision of the witness, that he did so on 16 December 1967 and still did so at the time of the trial.

Prior to trial, pursuant to an order duly issued, the defendant was sent to one of the State's hospitals for the insane for 60 days for observation. The examining psychiatrist was called as a witness for the State in rebuttal. He testified, as an expert witness, that he saw the defendant at intervals during the defendant's stay at the hospital from 1 April 1968 to 6 June 1968, and in the opinion of the witness the defendant "was sane during the time that he was confined to Cherry Hospital." From his study of the defendant during that period, it is his opinion that the defendant "was sane" and "knew right from wrong" on 16 December 1967, and knew "right from wrong" at the time the witness was so testifying at the trial. At the time the defendant was in the hospital, he had an I.Q. rating of 121, the normal rating being from 90 to 115.

In the examination of prospective jurors three of them stated of their own volition that they do not "swear." One of the three said he would like to be "affirmed." The other two made no statement as to affirmation. In each instance the court excused the juror "in the exercise of its discretion." The record shows an exception to each of these actions of the court but no objection at the time of the court's ruling. In oral argument counsel for the defendant stated that he did not interpose an objection at the time. The record discloses no questioning of or challenge to any of these three prospective jurors by either party. There is nothing in the record to indicate that any of the three would or would not have been acceptable either to the State or to the defendant.

Over the objection of the defendant the court sustained the State's challenge of prospective juror Corum. After explaining the nature of the case to this prospective juror, the solicitor asked:

> "In the event that you are sworn as a juror in this case, and in the further event that the State of North Carolina should furnish you with sufficient evidence in this case which in your opinion warranted a verdict of 'Guilty of Murder in the first degree,' do you or would you have any moral or religious scruples against bringing out a verdict of 'Guilty,' if you knew the penalty for that verdict would be death?"

The prospective juror answered that he would have such scruples. The solicitor then asked:

"Then is your feeling so strong about that, or are your scruples, whether they be religious or moral so strong that in no event you could ever bring out a verdict of guilty if you knew the penalty would be death?"

The prospective juror again answered in the affirmative.

The court then asked the solicitor, "Do you mean in this particular case?" and the solicitor replied that he did. The challenge was thereupon sustained.

Over objection by the defendant the solicitor's challenge for cause of prospective juror Thompson was allowed. The solicitor asked this prospective juror:

"In this particular case, after you have heard all of the evidence for the State and the evidence for defendant, if the evidence of the State should convince you beyond a reasonable doubt that the defendant is guilty, do you have any moral or religious scruples against bringing in a verdict of guilty in this particular case if you knew that the death penalty would be invoked?"

The prospective juror replied that he did have such scruples and had had such scruples ever since he could remember. The challenge was thereupon allowed.

Over the objection of the defendant the State's challenge of prospective juror Best was allowed. The solicitor asked this prospective juror:

"Mr. Best, if you are sworn as a juror in this particular case and if after having heard all of the evidence the State has satisfied you beyond a reasonable doubt that the defendant is guilty, would you and do you have any religious or moral scruples that would prevent you from bringing out a verdict of 'guilty' if you knew the sentence would be death?"

The prospective juror replied that he did have such scruples and had had them ever since he had been old enough to understand. Thereupon the challenge was allowed.

The record contains no other questioning of prospective jurors or statement concerning their selection except the following:

"There were 50 prospective jurors called to the stand before a jury was seated in this case and every juror called to the stand was asked the similar questions as set out above concerning capital punishment."

Fourteen jurors, including two alternates, were selected. The record does not show how many of the remaining 36 were challenged for cause, or for what cause, or peremptorily by the State or how many were so challenged by the defendant. It was conceded in oral argument that neither party had exhausted its peremptory challenges when the selection of the jury was completed.

In the course of the solicitor's argument to the jury, counsel for the defendant objected to the solicitor's statement, "His mother said she didn't remember whether she was charged with killing her first husband or not." The court replied, "I remember distinctly that she said it." The defendant contends that this was an unauthorized expression of an opinion by the court.

The grounds upon which the defendant seeks a new trial are these: (1) The allowance of the State's challenge for cause to the prospective jurors who expressed objections, as above shown, to capital punishment; (2) the court's excusing upon its own motion the prospective jurors who refused to be sworn, as above shown; (3) the overruling of the defendant's objections to the introduction in evidence of the photographs, the clothing and the bloody washcloth found upon the body of Kathy Carr and the shovel, above mentioned; (4) the court's permitting the expert pathologist to testify with reference to the child's having been raped and his use of photographs, above mentioned, to illustrate his testimony; (5) the court's permitting the psychiatrist to testify that the defendant knew right from wrong at the time of the alleged offense, during the time the psychiatrist observed the defendant and at the time of the trial; and (6) the statement of the court, above shown, concerning the testimony of the mother of the defendant.

*Attorney General Morgan and Deputy Attorney General Moody for the State.*

*George R. Kornegay, Jr., and John S. Peacock for defendant.*

LAKE, J.

G.S. 15-180 provides that an appeal to this Court from a judgment in a criminal action "shall be perfected and the case for the Supreme Court settled, as provided in civil actions." G.S. 1-282 provides that upon an appeal from a judgment in a civil action a copy of the appellant's statement of the case on appeal "shall be served on the respondent within fifteen days from the entry of the appeal taken * * * Provided, that the judge trying the case shall have the power, in the exercise of his discretion, to enlarge the time in

which to serve statement of case on appeal and exceptions thereto or counter statement of case."

**[1-3]**   By the terms of the statute, only the judge who tried the case can extend the time for serving the statement of the case on appeal and this Court has held that, having granted one extension, he may not grant another after the expiration of the term at which the judgment was entered. *Machine Co. v. Dixon,* 260 N.C. 732, 133 S.E. 2d 659. Normally, the effect of failure to serve the appellant's statement of the case on appeal within the time fixed by the statute, or within the period of such authorized extension by the trial judge, is that upon such appeal the Supreme Court is limited to a consideration of the record proper and if no errors appear on the face thereof, the judgment will be affirmed. *Machine Co. v. Dixon, supra; Twiford v. Harrison,* 260 N.C. 217, 132 S.E. 2d 321. "It is the duty of appellant to see that the record is properly made up and transmitted to the court." *State v. Stubbs,* 265 N.C. 420, 144 S.E. 2d 262.

**[4]**   The record shows that on the day the judgment was pronounced in the superior court the defendant gave notice of appeal to this Court and the presiding judge then extended the time allowed by the statute for the service of the appellant's statement of the case on appeal to 60 days. The two subsequent orders by the judge presiding at the trial, entered after the expiration of the term at which the judgment was pronounced, undertaking further to extend the time for the service of the appellant's statement of the case on appeal and a subsequent order entered by a different judge, undertaking further to extend the time for the service of the statement of the case on appeal, were nullities.

**[5-7]**   After an appeal is taken, the court from which it is taken has no authority with reference to the appellate procedure except that specifically conferred upon it by the statute. See *Machine Co. v. Dixon, supra.* Further extensions of time may be obtained only by petitions for certiorari directed to the court to which the appeal has been taken. No such petition was filed by the defendant with this Court. However, in the exercise of our discretion and in view of the imposition of the death penalty in the superior court, we, upon our own motion, treat the appeal as a petition for certiorari, allow the same and consider all assignments of error upon their merits as if the case on appeal had been served within the time properly allowed therefor.

*Jurors Challenged Because Of Views Concerning Capital Punishment*

**[13]**   The record discloses no error in the rulings of the trial judge

upon challenges for cause by the State to prospective jurors as the result of their stated views on the subject of capital punishment.

[8]    Prior to the decision of the Supreme Court of the United States in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776, it was well established that, under the law of this State, it was not error to allow challenges for cause by the State to prospective jurors who stated they had "conscientious scruples against the infliction of the death penalty" in a case where such penalty might be inflicted pursuant to a verdict of guilty. *State v. Spence* (first hearing), 271 N.C. 23, 155 S.E. 2d 802; *State v. Bumper* (first hearing), 270 N.C. 521, 155 S.E. 2d 173; *State v. Childs,* 269 N.C. 307, 152 S.E. 2d 453. See also *State v. Peele,* 274 N.C. 106, 161 S.E. 2d 568. In *State v. Vick,* 132 N.C. 995, 43 S.E. 626, the Court quoted with approval the following statement in 17 A. and E. Enc. 1134:

> "Though no such ground for challenge is to be found stated in the *English* cases, in the United States, since the early part of the nineteenth century, the fact that one has conscientious scruples against the infliction of capital punishment has been regarded as disqualifications furnishing ground for challenge by the prosecution, on a trial for an offense which may be punished by death."

The law of this State, as distinguished from the Constitution of the United States, has not been changed in this respect since those decisions were rendered.

[9]    The Constitution of the United States, as interpreted by the Supreme Court of the United States in the *Witherspoon* case, *supra,* is, of course, controlling insofar as it conflicts with the law of this State and we so recognized in *State v. Spence* (hearing on remand), 274 N.C. 536, 164 S.E. 2d 593. There we allowed a new trial because the record contained a stipulation that 79 of 150 veniremen were successfully challenged for cause "because of their stated opposition to capital punishment," this being contrary to the *Witherspoon* decision. The question now before us is whether the Constitution of the United States, as interpreted in the *Witherspoon* case, is violated by the allowance of the State's challenges for cause shown in the present record.

[10]    The majority opinion in the *Witherspoon* case sharply defines the line drawn by that decision by both positive and negative statements. The Court affirmatively stated its holding as follows:

> "Specifically, we hold that a sentence of death cannot be

carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause *simply* because they voiced *general objections* to the death penalty or expressed conscientious or religious *scruples* against its infliction." (Emphasis added.)

Speaking negatively, the Court said:

"The issue before us is a narrow one. It does not involve the right of the prosecution to challenge for cause those prospective jurors who state that their reservations about capital punishment would prevent them from making an impartial decision as to the defendant's guilt. Nor does it involve the State's assertion of a right to exclude from the jury in a capital case those who say that they could never vote to impose the death penalty *or that they would refuse even to consider its imposition in the case before them.* For the State of Illinois did not stop there, but authorized the prosecution to exclude as well all who said they were opposed to capital punishment and all who indicated that they had conscientious scruples against inflicting it." (Emphasis added.)

Again, in Footnote 21, the Court said:

"We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*"

[13] Prospective juror Corum stated specifically that his feeling against capital punishment was so strong that in no event could he ever bring out a verdict of guilty if he knew the penalty would be death.

Prospective juror Thompson stated that even if the evidence should convince him beyond a reasonable doubt of the guilt of the defendant he would have "moral or religious scruples against bringing in a verdict of guilty in this particular case" if he "knew that the death penalty would be invoked." Prospective juror Best stated that even though, after hearing all of the evidence, he was satisfied beyond a reasonable doubt that the defendant is guilty he would have "religious or moral scruples" which would prevent him "from

bringing out a verdict of 'guilty' " if he knew the sentence would be death.

**[11, 12]**  It is true that, at the time of the trial of this defendant in the superior court, G.S. 14-17 provided that the punishment for murder in the first degree would be imprisonment for life if, at the time of rendering its verdict in open court, the jury should so recommend, and, under the decisions of this Court, it was the duty of the trial judge in a capital case to instruct the jury that it might, in its unbridled discretion, render its verdict of guilty with such recommendation, which would then be binding upon the court in the matter of sentence. *State v. Carter,* 243 N.C. 106, 89 S.E. 2d 789; *State v. McMillan,* 233 N.C. 630, 65 S.E. 2d 212. The jury actually selected to try the defendant in the present case was so instructed. Since the verdict of a jury must be unanimous, it necessarily follows that if only one juror had refused to consent to a verdict of guilty of murder in the first degree without a recommendation that the punishment be imprisonment for life, the death sentence could not be imposed upon the defendant. Consequently, prospective jurors Corum, Thompson and Best could each have served upon the jury in the present case and rendered a verdict of guilty without violating his stated moral or religious scruples against the death penalty.

**[13]**  It does not follow, however, that the sustaining of the State's challenges to these prospective jurors violated the rule of the *Witherspoon* case, *supra.* It is perfectly clear from their answers in the record, upon voir dire examination, that each of these prospective jurors, before hearing any of the evidence, had already made up his mind that he would not return a verdict pursuant to which the defendant might lawfully be executed, whatever the evidence might be. In the language of the majority opinion in the *Witherspoon* case, these jurors made it clear that "they could never vote to impose the death penalty" and "they would refuse even to consider its imposition in the case before them," and "they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them."

**[14]**  The State, as well as the defendant, is entitled to a jury which will give it a fair and impartial verdict upon every issue properly presented by the evidence, including the question of whether, upon the evidence, the defendant, believed by them beyond any reasonable doubt to be guilty of first degree murder, should be executed or should be imprisoned for life. The decision in *Witherspoon v. Illinois, supra,* does not deprive the State of this right.

*Irving v. Breazeale,* 400 F. 2d 231, 236; *Williams v. Dutton,* 400 F. 2d 797, 805; *United States v. Valentine,* 288 F. Supp. 957, 966; *State v. Mathis,* 52 N.J. 238, 245 A. 2d 20, 23, 26; *State v. Smith,* (Wash.), 446 P. 2d 571. As the Supreme Court of the United States said in *Swain v. Alabama,* 380 U.S. 202, 85 S. Ct. 824, 13 L. Ed. 2d 759:

"The function of the challenge is not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence before them, and not otherwise.  *  *  *

Although historically the incidence of the prosecutor's challenge has differed from that of the accused, the view in this country has been that the system should guarantee 'not only freedom from any bias against the accused, but also from any prejudice against his prosecution. Between him and the State the scales are to be evenly held.' *Hayes v. Missouri,* 120 U.S. 68, 70."

[15, 16]    Following the recital of the voir dire examinations of the above prospective jurors and the rulings of the court sustaining the challenges of the State to them, the record contains the following statement:

"There were 50 prospective jurors called to the stand before a jury was seated in this case and every juror called to the stand was asked the similar questions as set out above concerning capital punishment."

There is nothing in this statement to show any error entitling the defendant to a new trial. It shows only that 36 prospective jurors were excused, 14, including two alternate jurors, having been selected. The record does not show how many of the 36 were challenged by the defendant or how many were challenged by the State or how many were challenged by either party peremptorily. Of those challenged successfully for cause, with the exception of the three named above, the record does not show that the challenge was based upon the answer of a single prospective juror to any question with reference to capital punishment. Indeed, the record does not show the answer of any juror to any question upon this subject other than the three prospective jurors above mentioned. The statement that "the similar questions as set out above concerning capital punishment" were asked each juror discloses no error, first because it does not show sufficiently the content of any question since those asked the prospective jurors Corum, Thompson, and Best were not identical, and second because there was certainly no error in allowing any ques-

tion identical to that propounded to any one of those three prospective jurors. Even if a prospective juror's answer to such a question were not sufficient to support a challenge for cause, it would certainly be proper to ask the question in order to permit the intelligent use of the peremptory challenges allowed by law to the State. See *Swain v. Alabama, supra.*

We, therefore, conclude that there is nothing in this record indicating any merit in the contention of the defendant that he has been denied any right under the Constitution of the United States, or under the law of this State, in the sustaining of any challenge for cause by the State by reason of the prospective juror's statement of his views on the subject of capital punishment.

*Jurors Excused Because Of Unwillingness To Take Oath*

[22]    The court's action in excusing, in its discretion and upon its own motion, three prospective jurors who refused to take the customary oath, is not ground for granting the defendant a new trial.

According to the record, only one of these prospective jurors expressed a willingness to affirm rather than swear. The record indicates that no question was propounded to any of them. They were not challenged. They were excused by the court. The record discloses no other information about any of them or concerning the reason for the court's action. The record does not state that they were excused because of their objection to taking an oath. While the record shows an exception by the defendant to each of these actions of the court, it does not show any objection thereto interposed at the time. In oral argument in this Court, counsel for the defendant stated frankly that no such objection was then interposed, the exceptions having been entered in preparation of the statement of the case on appeal.

[17-19]    The desire of a prospective juror to affirm rather than take an oath is not, of itself, cause for challenge in this State. See: G.S. 9-14; G.S. 11-11. On the other hand, nothing else appearing, even the erroneous allowance of an improper challenge for cause does not entitle the adverse party to a new trial, so long as only those who are competent and qualified to serve are actually empaneled upon the jury which tried his case. This is especially true where, as here, the adverse party did not exhaust his peremptory challenges. See: *State v. Vann,* 162 N.C. 534, 77 S.E. 295; *State v. Cunningham,* 72 N.C. 469, 474. The defendant is not entitled to a jury of his selection or choice but only to a jury selected pursuant to law and without unconstitutional discrimination against a class or substantial

group of the community from which the jury panel is drawn. He has no "vested right to a particular juror." *State v. Vann, supra.*

**[20]** It has long been established in this State that it is the right and duty of the court to see that a competent, fair and impartial jury is empaneled and, to that end, the court, in its discretion, may excuse a prospective juror without a challenge by either party. *State v. Vann, supra; State v. Vick, supra; State v. Boon,* 80 N.C. 461; *State v. Jones,* 80 N.C. 415. It is immaterial that this is done as the result of information voluntarily disclosed by the prospective juror without questioning. *State v. Vick, supra.*

**[21]** We must bear in mind that the trial judge had these prospective jurors before him and thus had an opportunity to observe their apparent qualifications, an advantage which a virtually empty record does not afford us. With nothing in the record to guide us, we cannot say that there was not in the appearance or manner of these three prospective jurors sufficient indication of their lack of qualification to serve as jurors in a case of this serious and important nature. But even if we might have reached a different conclusion in this respect from that reached by the trial judge, it has been settled in this State since as long ago as *State v. Ward,* 9 N.C. 443, that an irregularity in forming a jury is waived by silence of a party at the time of the court's action. There, Henderson, J., later C.J., said, "He shall not by consent of this kind, take a double chance" on acquittal by the jury so selected or a new trial because of such irregularity in the selection. See also *State v. Boon, supra.* For a recent recognition of the discretion of the trial judge in excusing a prospective juror without a challenge, see *State v. Spence* (first hearing), 271 N.C. 23, 32, 155 S.E. 2d 802.

**[22]** The defendant does not contend that this action of the trial judge was a systematic exclusion from the jury of members of a class to which the defendant himself belongs. His contention is that the court excluded from the jury a class of persons, i.e., those who have scruples against taking an oath, and thereby deprived the defendant of a jury drawn from a fair cross section of the community. See *Witherspoon v. Illinois, supra; Hernandez v. Texas,* 347 U.S. 475, 74 S. Ct. 667, 98 L. Ed. 866; *Thiel v. Southern Pacific Co.,* 328 U.S. 217, 66 S. Ct. 984, 90 L. Ed. 1181; *Smith v. Texas,* 311 U.S. 128, 61 S. Ct. 164, 85 L. Ed. 84.

There is nothing in the record to indicate that persons who have conscientious scruples against taking an oath that they will properly perform their duties as jurors constitute any substantial proportion of the prospective jurors in Wayne County and we know of

nothing which would so indicate. Nor does the record show, or circumstances known to us indicate, that jurors with such scruples would be less inclined than others to convict or to impose the death penalty. Such scruples are not limited to members of a single religious denomination or sect. It may well be that such a person would be a strict constructionist of the more retributive provisions of the Mosaic law. In any event, the defendant, having the same opportunity as the trial judge to observe these three prospective jurors in the courtroom, did not object to their being excused from the jury until after the verdict was rendered.

[23]    *Hernandez v. Texas, supra,* establishes that a defendant complaining of group discrimination in the selection of the jury which tried him has the burden of proving that persons excluded from the jury are members of a separate class in the county from which the jury comes. *Swain v. Alabama, supra,* states that the first step to be taken by such a defendant is to establish that the persons excluded belong to an "identifiable group in the community which may be the subject of prejudice." That is, the ultimate question in such a situation is whether the jury selected represented a fair cross section of the entire community. The burden is upon the defendant to establish that it did not. *Swain v. Alabama, supra; Hernandez v. Texas, supra.* The record before us does not lead to this conclusion.

### Introduction Of Photographs, Clothing, Etc.

[24, 32, 33]    The court did not err in the admission, over objection, of the clothing and washcloth found upon the body of the deceased child, the shovel obtained by the officers from the residence of the defendant with his permission or the photographs used by the witnesses of the State to illustrate their testimony concerning the location and appearance of the place where the child's body was found buried and the condition of the body. It is not contended that the articles of clothing and the washcloth were not properly authenticated and identified or that the photographs are in any respect inaccurate portrayals of what they purport to represent or were not properly taken and authenticated.

[24]    In *State v. Speller,* 230 N.C. 345, 53 S.E. 2d 294, this Court held there was no error in admitting into evidence garments worn by the alleged victim of a rape and murder, which garments bore tears and stains corroborative of the State's theory of the case. In *State v. Vann, supra,* it was held that there was no error in permitting articles found at the place of a homicide to be exhibited to the jury, these being competent to identify the body, or to establish a fact

relevant to the State's theory of the case or to enable the jury to realize more completely the cogency and force of the testimony of witnesses. Thus, clothing worn by the alleged victim of a felonious homicide may properly be introduced in evidence to show the location of a wound upon the person of the deceased. *State v. Fleming,* 202 N.C. 512, 163 S.E. 453. See also: *State v. Bass,* 249 N.C. 209, 105 S.E. 2d 645; *State v. Petry,* 226 N.C. 78, 36 S.E. 2d 653.

[25]    In the present case, the jury was properly instructed that the photographs in question were allowed in evidence for the sole purpose of illustrating the testimony of witnesses and not as substantive evidence. See: *State v. Norris,* 242 N.C. 47, 86 S.E. 2d 916; *State v. Perry,* 212 N.C. 533, 193 S.E. 727. The fact that a photograph depicts a horrible, gruesome and revolting scene, indicating a vicious, calculated act of cruelty, malice or lust, does not render the photograph incompetent in evidence, when properly authenticated as a correct portrayal of conditions observed by and related by the witness who uses the photograph to illustrate his testimony. *State v. Porth,* 269 N.C. 329, 153 S.E. 2d 10; *State v. Rogers,* 233 N.C. 390, 64 S.E. 2d 572, 28 A.L.R. 2d 1104; *State v. Gardner,* 228 N.C. 567, 46 S.E. 2d 824; Stansbury, North Carolina Evidence, 2d Ed., § 34. For a collection of authorities to the same effect from other jurisdictions, see Annot., 73 A.L.R. 2d 769.

[26-28]    "Ordinarily, photographs are competent to be used by a witness to explain or illustrate anything it is competent for him to describe in words." *State v. Gardner, supra.* The fact that the photographs are in color does not affect their admissibility. *State v. Hill,* 272 N.C. 439, 158 S.E. 2d 329; *People v. Moore,* 48 Cal. 2d 541, 310 P. 2d 969; *Commonwealth v. Makarewicz,* 333 Mass. 575, 132 N.E. 2d 294; Annot., *supra,* p. 811. Thus, in a prosecution for homicide, photographs showing the condition of the body when found, the location where found and the surrounding conditions at the time the body was found are not rendered incompetent by their portrayal of the gruesome spectacle and horrifying events which the witness testifies they accurately portray. *State v. Stanley,* 227 N.C. 650, 44 S.E. 2d 196; *State v. Cade,* 215 N.C. 393, 2 S.E. 2d 7.

[29-31]    It is not necessary that the photograph be taken by the witness, if the witness testifies that it correctly represents what the witness observed. *State v. Stanley, supra;* Stansbury, North Carolina Evidence, 2d Ed., § 34. A photograph of the body of the deceased is not inadmissible by reason of the fact that it was taken after the body had been moved from the place where originally found and carried to the morgue or other place for examination.

*State v. Gardner, supra; State v. Miller,* 219 N.C. 514, 14 S.E. 2d 522. Obviously, the fact that the photograph was taken and portrays the condition of the body at some time after the homicide occurred does not, of itself, make the photograph incompetent. *State v. Hill, supra; State v. Lentz,* 270 N.C. 122, 153 S.E. 2d 864; *State v. Porth, supra;* Stansbury, North Carolina Evidence, 2d Ed., § 34.

[32]    The photographs in question, meeting the test of relevancy and being properly authenticated, were properly admitted in evidence for the limited purpose stated by the trial judge, and, consequently, there was no error in permitting the jury to see them. *State v. Mays,* 225 N.C. 486, 35 S.E. 2d 494.

[33]    The shovel taken by the officers from the defendant's home, with his permission, immediately after the child's body was removed from the place where the defendant had admitted he buried it, was clearly competent for admission in evidence. The defendant's statement to the officers was that he had dug the shallow grave with "his shovel" which he then returned to the place behind his house where the officers found it covered with dirt of the same type as that of the soil in the child's burial place.

## Evidence Tending To Show Another Crime

[36]    There was no error in allowing the pathologist, properly qualified as an expert witness, to testify as to the conditions he observed upon the child's body and his conclusion therefrom that she had been raped, nor was it error to permit this witness to use the properly authenticated photographs of the body to illustrate his testimony.

[34, 35]    The defendant contends that this was error because it was testimony tending to show the commission of a criminal offense (rape) other than that of murder for which the defendant was on trial. While it is well established that evidence of other crimes, having no bearing upon the crime for which the defendant is on trial, may not be introduced prior to his taking the stand as a witness in his own behalf, it is equally well settled that all facts, relevant to the proof of the defendant's having committed the offense with which he is charged, may be shown by evidence, otherwise competent, even though that evidence necessarily indicates the commission by him of another criminal offense. *State v. Christopher,* 258 N.C. 249, 128 S.E. 2d 667; *State v. McClain,* 240 N.C. 171, 81 S.E. 2d 364; *State v. Harris,* 223 N.C. 697, 28 S.E. 2d 232; Stansbury, North Carolina Evidence, 2d Ed., § 91. Thus, such evidence of other offenses is competent to show "the crime charged was committed for the purpose of concealing another crime," *State v. Beam,* 184 N.C. 730, 115

S.E. 176, or to show "a motive on the part of the accused to commit the crime charged," *State v. McClain, supra,* or to show the *quo animo,* intent, design, guilty knowledge, or scienter, or to make out the *res gestæ,* or to exhibit a chain of circumstances in respect of the matter on trial, when such crimes are so connected with the offense charged as to throw light upon one or more of these questions. *State v. Christopher, supra; State v. Harris, supra;* Stansbury, North Carolina Evidence, 2d Ed., §§ 91 and 92.

In *State v. Westmoreland,* 181 N.C. 590, 107 S.E. 438, in sustaining a death sentence for murder in the first degree, this Court, speaking through Walker, J., said. "There are authorities for the position that any unseemly conduct toward the corpse of the person slain, or any indignity offered it by the slayer, and also concealment of the body, are evidence of expressed malice, and of premeditation and deliberation in the slaying, depending, of course, upon the peculiar circumstances of the case."

[36]  It was entirely proper in the present instance to permit the State to offer this evidence, including the photographs, to establish the motive, premeditation, deliberation and malice on the part of the defendant for and in the murder with which he was charged by the State.

### Testimony As To Insanity

[39]  There was no error in permitting the psychiatrist, duly qualified as an expert witness, who examined the defendant, pursuant to the order of the court, some three and a half months after the alleged offense, to testify that upon the basis of his observation of the defendant he was of the opinion that the defendant "knew right from wrong" on the date the offense was alleged to have been committed.

This witness was duly qualified as an expert witness in the field of psychiatry and testified to his observation of and examination of the defendant over a substantial period of confinement of the defendant for that purpose in the State hospital. He was called by the State to rebut the testimony of the defendant's mother that, in her opinion, the defendant was not capable of distinguishing between right and wrong in relation to the charge of murder on the date the offense was alleged to have occurred, her testimony being upon the basis of her observation of the defendant prior to and after that date.

[37, 38]  In this State, the test of insanity as a defense to an alleged criminal offense is the capacity of the defendant to distinguish

between right and wrong at the time of and in respect of the matter under investigation. *State v. Spence* (first hearing), 271 N.C. 23, 155 S.E. 2d 802; *State v. Matthews*, 226 N.C. 639, 39 S.E. 2d 819. Evidence tending to show the mental condition of the accused, both before and after the commission of the act, is competent provided it bears such relation to the defendant's condition of mind at the time of the alleged crime as to be worthy of consideration in respect thereto. *State v. Duncan*, 244 N.C. 374, 93 S.E. 2d 421. Obviously, it would not be practicable to limit expert testimony upon this subject to witnesses who had the defendant under observation at the instant the act in question was committed.

[39]   In *State v. Matthews, supra,* it is said that a witness may not testify as to his opinion concerning the mental capacity of the defendant to commit the specific crime with which he is charged. The State's expert witness in the present case did not so testify. He testified that in his opinion, based upon his subsequent examination of the defendant, the defendant knew "right from wrong" on the day of the alleged offense. The witness, being an expert in the field of psychiatry, was competent to relate to the jury such opinion though he did not observe the defendant on the precise date of the alleged offense.

[40]   It is to be noted that two other witnesses, the only ones who were in the defendant's company and who did observe him on that day, one when he left her home with the child at 6 p.m., and the other when he entered the restaurant and reported the child missing at approximately 9:45 p.m., each testified that he appeared to be and acted "normal." His own witnesses, with the exception of his mother, testified that they observed no evidences of insanity. The burden rests upon the defendant to establish this defense "to the satisfaction of the jury." *State v. Harris*, 223 N.C. 697, 28 S.E. 2d 232.

### Comment By Trial Judge

[41]   The defendant assigns as error the comment of the trial judge in response to the defendant's objection to a statement by the solicitor in the latter's argument to the jury. The statement by the solicitor was, "his [the defendant's] mother said she didn't remember whether she was charged with killing her first husband or not." When the defendant's counsel objected, the court replied, "I remember distinctly that she said it." The defendant is not entitled to a new trial on this account.

The narrative summary of the testimony of the defendant's mother set forth in the record before us does not contain this alleged

statement by her. She did testify: "I have been married twice. I did not kill my second husband but I was convicted and served time for his murder." There was testimony by another witness that her first husband (the father of the defendant) "committed suicide when (the defendant) was only four months old." In reviewing the evidence in his charge to the jury, as he was required to do by the statute, the trial judge again stated that the defendant's mother testified "she was convicted of murdering her second husband, that she did not recall and does not remember whether she was charged with killing her first husband, the father of the defendant." To this statement the defendant did not object and he made no attempt to call its alleged inaccuracy to the attention of the court.

[42] It is not required that the appellant set forth in his statement of the case on appeal the evidence in its entirety. On the contrary, G.S. 1-282 states that the case on appeal shall be "a concise statement of the case," and it is common practice to omit portions of the testimony deemed by the parties of no consequence upon the appeal. Our examination of the entire charge of the court discloses that there were a number of instances in which evidence summarized therein by the judge for the benefit of the jury is not otherwise reflected in the record before us. These indicate that in the preparation of the statement of the case on appeal the appellant did not undertake to set out the evidence in its entirety.

[41] The court correctly instructed the jury that it was to recall all of the testimony and to be guided by its recollection and not by the court's summary of the evidence. While it is error for the court to express an opinion to the jury reflecting upon the credibility of a witness, *State v. Auston,* 223 N.C. 203, 25 S.E. 2d 613, we think it a strained construction of the remark of the court in this instance to call it an expression of opinion by the court as to the credibility of the witness. If it was, it is obvious that the statement was not prejudicial error since the witness had admitted her conviction of the murder of the second husband. It is inconceivable that this statement by the court, even if inaccurate, affected the verdict of the jury. It does not justify awarding a new trial to the defendant. The point is not stressed by the defendant in his brief.

## Validity Of The Death Sentence

[43] The defendant does not, in his assignments of error or in his brief, question the validity of the judgment imposing the death sentence, as such. Nevertheless, his appeal is, itself, an exception to the judgment and thus brings before us for review all matters

appearing on the face of the record proper, including the sufficiency of the verdict to support the imposition of the death sentence. 1 Strong, North Carolina Index 2d, Appeal and Error, § 26, and cases there cited. We, therefore, turn to the question of whether the verdict of guilty of murder in the first degree, without more, authorized the superior court to enter its judgment sentencing the defendant to death by asphyxiation.

In *State v. Peele, supra,* we said that the decision of the Supreme Court of the United States in *United States v. Jackson,* 390 U.S. 570, 88 S. Ct. 1209, 20 L. Ed. 2d 138, "is not authority for holding the death penalty in North Carolina may not be imposed under any circumstances for the crime of rape." Bobbitt and Sharp, JJ., concurring in result, were of the opinion that the *Peele* case did not present for this Court's determination whether the *Jackson* case "invalidates the death penalty under present North Carolina statutes."

In *State v. Spence* (hearing on remand), 274 N.C. 536, 164 S.E. 2d 593, we said, "This Court has already held, in *State v. Peele, supra,* that *United States v. Jackson,* * * * is not authority for holding capital punishment is abolished altogether in North Carolina." Bobbitt and Sharp, JJ., dissented from so much of the decision in the *Spence* case as directed a new trial, their view being "the death penalty provisions of our present statutes, when considered in the light of *Jackson,* are invalid."

Whether or not the question of the effect of *United States v. Jackson, supra,* upon G.S. 14-17 was before us in either *State v. Peele, supra,* or in *State v. Spence, supra,* it is before us in the present case. We reaffirm the views expressed upon this question in the majority opinions of this Court in *State v. Peele, supra,* and *State v. Spence, supra.*

G.S. 14-17 provides:

"*Murder in the first and second degree defined; punishment.* — A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or other felony, shall be deemed to be murder in the first degree and shall be punished with death; Provided, if at the time of rendering its verdict in open court, the jury shall so recommend, the punishment shall be imprisonment for life in the State's prison, and the Court shall so instruct the jury. * * *"

The proviso was added by an amendment enacted in 1949, the remainder of the statute having been enacted in 1893.

G.S. 15-162.1 was enacted in 1953. Though subsequently repealed by Chapter 117 of the Session Laws of 1969, it was in effect at the time of the defendant's trial below. It provided that any person, charged in a bill of indictment with murder in the first degree, might, after arraignment, tender in writing, signed by himself and his counsel, a plea of guilty of such crime, and the State, with the approval of the court, might accept such plea or reject it, in which latter event the trial should proceed upon a plea of not guilty and the tender of the plea of guilty would have no legal significance. G.S. 15-162.1 then provided:

> "(b)  In the event such plea is accepted, the tender and acceptance thereof shall have the effect of a jury verdict of guilty of the crime charged with recommendation by the jury in open court that the punishment shall be imprisonment for life in the State's prison; and thereupon, the court shall pronounce judgment that the defendant be imprisoned for life in the State's prison."

[44]  It is to be noted that G.S. 14-17, providing for the sentence to be imposed upon a verdict returned by the jury, and G.S. 15-162.1, providing for the sentence to be imposed upon an accepted plea of guilty, were separate and distinct statutes, G.S. 14-17 having been in full effect long before G.S. 15-162.1 was enacted. It cannot, therefore, be doubted that they were always separate and distinct legislative provisions, that G.S. 14-17 is capable of standing alone as it did for several years and that the validity of G.S. 14-17 cannot be affected adversely by the invalidity, if any, of G.S. 15-162.1. The repeal of G.S. 15.162.1, leaving G.S. 14-17 intact, shows the 1969 Legislature's intent for G.S. 14-17 to stand alone.

In *United States v. Jackson, supra,* the Supreme Court of the United States reversed a judgment of the District Court which had dismissed an indictment for violation of the Federal Kidnapping Act, 18 U.S.C. § 1201. That Act provided:

> "Whoever knowingly transports in interstate * * * commerce, any person who has been unlawfully * * * kidnaped * * * and held for ransom * * * shall be punished (1) by death if the kidnaped person has not been liberated unharmed, and if the verdict of the jury shall so recommend, or (2) by imprisonment for any term of years or for life, if the death penalty is not imposed."

As the Supreme Court of the United States observed in its opinion in the *Jackson* case, the Federal Kidnapping Act, as originally enacted by Congress in 1932, contained no provision for the infliction of capital punishment. An amendment, enacted in 1934, inserted the provision authorizing the death penalty to be imposed under specific circumstances, "if the verdict of the jury shall so recommend." The decision of the Jackson case was that the amendment of 1934 was unconstitutional for the reason that it imposed "an impermissible burden upon the exercise of" the defendant's constitutional right to demand a jury trial.

Prior to the adoption of the 1934 amendment, one accused of violating the Federal Kidnapping Act could exercise his constitutional right to demand a jury trial without risk of the death penalty if the jury found him guilty. Under the 1934 amendment, he could not. For this reason, the Court held the 1934 amendment authorizing the jury to fix the penalty at death was unconstitutional, not because the death penalty, per se, is unconstitutional but because the 1934 amendment discouraged the exercise of the defendant's constitutional right to a trial by jury. The Court then said that the original Federal Kidnapping Act, which contained no provision discouraging the exercise of the right to a jury trial, could and should stand as a separate, divisible statutory enactment apart from the 1934 amendment. Consequently, the Court struck from the act the 1934 amendment, leaving the act in its original form, and held the indictment valid.

[44, 45]    The legislative history of G.S. 14-17 and G.S. 15-162.1 bears no similarity whatever to the legislative history of the Federal Kidnapping Act. If there was anything in these two statutes which discouraged the defendant from demanding a jury trial, it was found in G.S. 15-162.1, the later of the two separate and distinct statutes. The constitutionality of G.S. 15-162.1, while in effect, is not presently before us and we express no opinion with reference to its then validity. If, however, that statute is subsequently held invalid upon the ground suggested in *United States v. Jackson, supra,* or otherwise, such decision will not and cannot affect the validity of G.S. 14-17, a wholly separate, independent, previously existing and surviving statute. Thus, the decision in *United States v. Jackson, supra,* did not, at the time of the judgment in this case, and does not now forbid the courts of this State to impose the sentence of death pursuant to a verdict of the jury in accordance with G.S. 14-17.

[46]    *United States v. Jackson, supra,* arose on a motion to dismiss the indictment. The present case comes before us after the de-

fendant has pleaded to the indictment. In the *Jackson* case, it was not known how the defendant might wish to plead. In this case, the defendant pleaded not guilty and was tried by a jury. Whatever the effect of G.S. 15-162.1 might have been upon other defendants charged with first degree murder, its being in the statute book at the time of this defendant's arraignment and trial did not discourage him from exercising his constitutional right to a trial by jury.

[47]    There remains for decision the question of whether the imposition of the death penalty for first degree murder is unconstitutional per se. The Supreme Court of the United States has not so declared. We find nothing in the Constitution of the United States which leads us to such a conclusion.

[48]    The imposition of the death penalty upon a conviction of murder is expressly authorized by Article XI, § 2, of the Constitution of North Carolina, adopted in 1868. G.S. 14-17 was enacted pursuant to that constitutional provision. The history of this provision in our State Constitution is of major significance in the determination of the effect of the Fourteenth Amendment to the Constitution of the United States upon the authority of North Carolina to impose the death penalty. This provision reads as follows:

> *"Death punishment.* — The object of punishments being not only to satisfy Justice, but also to reform the offender, and thus prevent crime, murder, arson, burglary, and rape, and these only, may be punishable with death, if the General Assembly shall so enact."

Prior to the Constitution of 1868, there was no reference to the death penalty in the Constitution of North Carolina. The death penalty was, nevertheless, imposed in many cases in this State from the winning of our independence down to 1868, just as it was imposed during that period by the courts of the other states of the Union, under the provisions of statutes enacted in recognition of the power of the Legislature of a state to fix, in its discretion, a punishment for crime, unless forbidden to do so by a constitutional provision.

It is a matter of well known history that the Constitution of 1868 was adopted by this State in order to meet conditions imposed by the Federal Congress upon the right of this State to send its lawful representatives to the Congress following the Civil War. See: Woodrow Wilson, History of the American People, Vol. V, pp. 37, 44, 46; Hamilton, Reconstruction In North Carolina, pp. 187, 215, 217, 288. It was adopted contemporaneously with the ratification of

the Fourteenth Amendment to the Constitution of the United States. Obviously, the entire Constitution of North Carolina of 1868 was examined with care by the very Congress which proposed the Fourteenth Amendment to the states and was approved by that Congress. See Hamilton, op. cit., p. 288.

[49]    In the light of this constitutional history, it is inconceivable that the Congress which submitted the Fourteenth Amendment, or the states which ratified it, regarded anything therein as prohibiting a state to impose the death penalty upon conviction of first degree murder. The widespread and frequent imposition of the death penalty by the courts of the several states in the one hundred years which have elapsed since the adoption of the Fourteenth Amendment, and the acquiescence therein by the Supreme Court of the United States in cases innumerable, clearly refute the suggestion that the Fourteenth Amendment prevents the State of North Carolina from sentencing this defendant to death pursuant to G.S. 14-17.

The constitutionality of a state statute cannot be determined by taking a Gallup poll of the opinion of the public with reference to the efficacy or the morality of a statute authorizing the imposition of the death penalty, even if it be assumed that the question can be framed so as to be understood by all of those reached by the takers of the "straw vote." The power of a sovereign state of this Union to enact legislation is to be determined by the courts, not by public opinion polls or by writings in sociological journals or treatises. It is the duty of this Court to determine whether the State of North Carolina has that power in the light of the history of the constitutional provisions said to forbid its exercise and in the light of the long line of judicial interpretations of those constitutional provisions. Our determination is not to be guided by tabulations of answers to public opinion polls, said to have been received by the poll takers from unknown members of the public, not shown to have been advertent to either the language of such constitutional provisions, their history or their interpretation by the courts of this country.

[50]    It is not for this Court, or any other court, to determine whether the provision imposing the death penalty for the commission of first degree murder is or is not a wise policy for a state concerned with the protection of its people from such acts. It is not for us, or any other court, to determine whether a statute providing for the death penalty is a more effective deterrent to first degree murder than some other penal provision would be. It is for the Legislature of North Carolina to make that decision. It has done so in the enactment of G.S. 14-17 and, within recent days, has reaffirmed that

policy determination by its rejection of a proposal to abolish the
provision for the imposition of the death penalty. The sole question
before us, in this connection, is whether there is any provision of the
State or Federal Constitution which prevents the Legislature of
North Carolina from adopting such policy and enacting a statute to
carry it into effect. We find no such provision in either Constitution.

### *Review Of The Record Ex Mero Motu*

**[51]**    It has long been the rule of this Court that "in capital cases
the Supreme Court will review the record and take cognizance of
prejudicial error *ex mero motu.*" See    *State v. Oakes,* 249 N.C. 282,
106 S.E. 2d 206. We have reviewed the entire record in this case,
without limitation to the assignments of error made by the defend-
ant.

The defendant has been represented throughout this proceeding
with diligence and skill by two able attorneys, experienced in the
practice of criminal law in the courts of Wayne County and in this
Court. They were appointed to represent him, without expense to
him, several months prior to the calling of his case for trial. He has
been given, free of expense to him, expert psychiatric examination
to determine his mental competency to plead to the charge brought
against him. Without expense to him, the record of his trial and the
brief of his able counsel have been prepared and made available to
this Court for review. We have carefully considered every part of
that record and the earnest arguments of his counsel. The State of
North Carolina has afforded him a fair trial in accordance with its
established procedures applicable to all such cases.

The evidence is ample to support the finding that the defendant,
a sane man, with malice aforethought and with premeditation and
deliberation, killed his four year old stepdaughter, Kathy Carr, that,
after first grievously injuring her in a manner she could not under-
stand, he took a shovel, placed it and the bleeding child, who had
been taught to love and trust him, in his car, drove 18 miles to a
lonely area, left the little child in the car, went into the woods, dug
her grave, returned to the car and, taking her little hand in his, led
her through the dark woods to the hole he had dug, there smothered
her to death with his hands, threw her body into the hole and covered
it in such a manner that only the defendant and God would know
her resting place.

The jury has, upon this evidence, under full and correct instruc-
tions of the trial judge as to the law, found him guilty of first degree
murder and has concluded that he should be executed in the manner

provided by law. The statute of this State authorized the jury to return such verdict and required the judge, thereupon, to enter the judgment contained in the record. We find no error of law in the trial which would justify us in granting the defendant a new trial or in vacating or modifying the judgment.

No error.

HIGGINS, J., concurring:

The defendant was indicted for murder in the first degree. When arraigned, he entered a plea of not guilty. The parties to the trial selected a jury satisfactory to both. After full hearing and determination, the jury returned a verdict of guilty as charged. The court followed the mandate of G.S. 14-17 and imposed a death sentence. This Court has held the trial was free from error. So long as the verdict stands, no other sentence or judgment is authorized.

In my opinion the rule announced by the Supreme Court in *United States v. Jackson*, 390 U.S. 570 is not applicable in this case. Jackson was indicted for kidnapping. For that offense the law empowered the judge to punish by imprisonment. The Kidnapping Act, however, provides that if the victim is not released unharmed, the jury may fix the punishment at death. The jury, but not the judge, has such power. By a plea of guilty, the kidnapper bypassed the jury and placed himself before the trial judge whose power to punish is limited to imprisonment. The Supreme Court held the fear of the death penalty was a chill on the constitutional right of the accused to plead not guilty and to demand a jury trial. The danger to be avoided is the risk that an innocent man may be caught in a mesh of circumstances which induces him to plead guilty rather than permit a jury with its power of life or death to pass on his case.

In the light of *Jackson*, the defendant Atkinson might have reason to complain if he had entered a plea of guilty under the provisions of G.S. 15-162.1 (now repealed) and submitted to a life sentence. He might allege that his rights to plead not guilty and to have a jury trial were abandoned because he feared the result incident to a jury verdict. These considerations, in no wise, interfered with Atkinson's constitutional right to plead not guilty and to have a jury trial. He pled not guilty. He had a jury trial. His constitutional rights, in no particular, were denied him. So far as the assertion of these rights was concerned, G.S. 15-162.1 was not involved.

If the Court undertakes to determine that punishment for murder in the first degree shall be by imprisonment, it goes beyond the au-

thority of G.S. 14-17 and I think beyond the function of proper appellate review, and invades the legislative field.

I concur in the Court's opinion.

BOBBITT, J., dissenting as to death sentence:

I vote to vacate the judgment imposing the death sentence. In my opinion, the verdict of guilty of murder in the first degree should be upheld and the cause remanded for pronouncement of a judgment imposing a sentence of life imprisonment.

When the loathsome and despicable crime was committed and when defendant was arraigned, tried and sentenced, the statutes in force relating to first degree murder were codified as G.S. 14-17 and as G.S. 15-162.1. G.S. 14-17 has continued and is now in force. G.S. 15-162.1 was repealed (effective March 25, 1969) by Chapter 117, Session Laws of 1969.

G.S. 14-17 and G.S. 15-162.1, when both were in force, were *in pari materia.* Considered and construed together, they set forth a unitary statutory plan for the punishment of first degree murder by death *or* by life imprisonment. The tender and acceptance of a plea of guilty of first degree murder in accordance with G.S. 15-162.1 removed the possibility of a death sentence. The possibility of a death sentence remained if a defendant pleaded not guilty and was placed on trial for first degree murder. If found guilty of first degree murder, the punishment was death unless the jury in its *unbridled* discretion saw fit to recommend that the punishment be imprisonment for life.

It was and is my opinion that, until G.S. 15-162.1 was repealed, decisions of the Supreme Court of the United States in *United States v. Jackson,* 390 U.S. 570, 20 L. ed. 2d 138, 88 S. Ct. 1209, and *Pope v. United States,* 392 U.S. 651, 20 L. ed. 2d 1317, 88 S. Ct. 2145, invalidated *the death penalty provision* of G.S. 14-17 and that no valid sentence of death could be pronounced.

The *death penalty provisions* of the Federal Kidnapping Act (18 U.S.C. § 1201(a)) and of the Federal Bank Robbery Act (18 U.S.C. § 2113(e)) were held invalid in *Jackson* and in *Pope,* respectively, because they imposed an impermissible burden upon an accused's exercise of his Fifth Amendment right not to plead guilty and his Sixth Amendment right to demand a jury trial. No other provision of either of these statutes was invalidated. In gist, these decisions held that no *death penalty provision* is valid if applicable only to defendants who assert the right to contest their guilt before a jury.

Reference is made to my (concurring in part and dissenting in part) opinion in *State v. Spence,* 274 N.C. 536, 545, 164 S.E. 2d 593, 598, for the full provisions of G.S. 14-17 and G.S. 15-162.1, and to the discussion therein of each of the following decisions: *United States v. Jackson, supra; Pope v. United States, supra; State v. Harper,* 162 S.E. 2d 712 (S.C. 1968); *State v. Forcella,* 245 A. 2d 181 (N.J. 1968); *Alford v. North Carolina,* 405 F. 2d 340 (4 Cir. 1968); *In re Anderson,* 447 P. 2d 117 (Cal. 1968).

The majority opinion herein seeks to uphold the validity of the death sentence on grounds other than those expressed in support of its validity in *State v. Peele,* 274 N.C. 106, 161 S.E. 2d 568, and adopted in *Parker v. State,* 2 N.C. App. 27, 162 S.E. 2d 526. Hereafter, this opinion relates primarily to the asserted new grounds upon which the majority rely.

In my opinion, no provision of the Constitution of the United States prohibits our General Assembly from providing for the punishment by death of a defendant who is convicted of the crime of murder in the first degree. It is the province of the General Assembly to determine whether, as a matter of State policy, murder in the first degree should be punished by death. I am in accord with the majority's holding that the imposition of the death penalty for murder in the first degree is not unconstitutional *per se.* We differ as to whether *Jackson* and *Pope* invalidated the death penalty provision of G.S. 14-17 during the period prior to the repeal of G.S. 15-162.1.

In the majority opinion, emphasis is placed on the fact defendant pleaded not guilty and that the death sentence was pronounced pursuant to the verdict of the jury. In *Jackson* and *Pope,* whether a defendant pleaded guilty or not guilty had no bearing upon the validity of the death penalty provision. It was held the death penalty provision itself was invalid.

In *Jackson,* the defendant did not plead to the indictment but moved to quash it. It was held the *death penalty provision* was invalid but that the statute was otherwise valid and the prosecution would proceed on the indictment but in no event could a death sentence be pronounced. In *Pope,* as in the present case, the defendant pleaded not guilty and the jury which convicted him directed that he be punished by death. Holding the *death penalty provision* invalid, the judgment of the Court of Appeals which sustained the death sentence was vacated and the cause was remanded for further proceedings consistent with the opinion.

In my opinion, the death penalty provision of G.S. 14-17 during the period prior to the repeal of G.S. 15-162.1 was invalid under all circumstances. Its invalidity did not vary from case to case according to each defendant's plea.

The majority opinion asserts that *Jackson* invalidated the 1934 Act, which amended the Federal Kidnapping Act. In my opinion, *Jackson* invalidated only the death penalty provision of the 1934 Act.

The full text of the Act of May 18, 1934, 48 Stat. 781-782, is quoted below.

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Act of June 22, 1932 (U.S.C., ch. 271, title 18, sec. 408a), be, and the same is hereby, amended to read as follows:

" 'Whoever shall knowingly transport or cause to be transported, or aid or abet in transporting, in interstate or foreign commerce, any person who shall have been unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away by any means whatsoever and held for ransom or reward or otherwise, except, in the case of a minor, by a parent thereof, shall, upon conviction, be punished *(1) by death if the verdict of the jury shall so recommend, provided that the sentence of death shall not be imposed by the court if, prior to its imposition, the kidnaped person has been liberated unharmed, or (2) if the death penalty shall not apply nor be imposed the convicted person shall be punished* by imprisonment in the penitentiary for such term of years as the court in its discretion shall determine: *Provided, That the failure to release such person within seven days after he shall have been unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away shall create a presumption that such person has been transported in interstate or foreign commerce, but such presumption shall not be conclusive.*

" 'SEC. 2. The term "interstate or foreign commerce", as used herein, shall include transportation from one State, Territory, or the District of Columbia to another State, Territory, or the District of Columbia, or to a foreign country, or from a foreign country to any State, Territory, or the District of Columbia.

" 'SEC. 3. If two or more persons enter into an agreement, confederation, or conspiracy to violate the provisions of the foregoing Act and do any overt act toward carrying out such unlawful agreement, confederation, or conspiracy, such person or persons shall be punished in like manner as hereinbefore provided by this Act.' "

The 1934 Act, a complete statute, incorporates the provisions of the (original) Federal Kidnapping Act of June 22, 1932, 47 Stat. 326, and in addition the *italicized portion* enacted originally by the 1934 Act. It is noteworthy that the proviso in Section 1, which was enacted originally by the 1934 Act, was not invalidated by the decision in *Jackson.*

The death penalty provision considered in *Pope* was an integral part of the Act of May 18, 1934, 48 Stat. 783, the basic (original) Federal Bank Robbery, Act. Section 3 of the 1934 Federal Bank Robbery Act provided: "Whoever, in committing any offense defined in this Act, or in avoiding or attempting to avoid apprehension for the commission of such offense, or in freeing himself or attempting to free himself from arrest or confinement for such offense, kills any person, or forces any person to accompany him without the consent of such person, shall be punished by imprisonment for not less than 10 years, or by death if the verdict of the jury shall so direct." In *Pope,* the death penalty provision, an integral part of the original statute, was held invalid. No statute *amending the original act* was involved.

It is noted that the decisions in *Jackson* and in *Pope* did not impair the right of a defendant to tender or the right of the court to accept or refuse to accept a plea of guilty or *nolo contendere* as provided in Rule 11 of the Federal Rules of Criminal Procedure. See my opinion in *Spence,* 274 N.C. at 553, 164 S.E. 2d at 603.

The majority opinion suggests that *Jackson* may have invalidated G.S. 15-162.1 rather than the death penalty provision of G.S. 14-17. I cannot accept this view. G.S. 15.162.1 provided for punishment by life imprisonment when a plea of guilty of first degree murder was tendered and accepted. In such case, neither the judge nor the jury had any discretionary power in respect of punishment. Obviously, the General Assembly had authority to provide for the tender of such plea and for punishment by life imprisonment upon acceptance thereof. I perceive no invalidity whatever in that statute. The impact of this valid statute is what rendered invalid the death penalty provision of G.S. 14-17. G.S. 15-162.1 was based on Chapter 616, Session Laws of 1953, which repealed all laws and clauses of laws in conflict therewith.

Recent decisions in which *Jackson* is considered are noted below.

In *King v. Cook,* 211 So. 2d 517, it was held that *Jackson* did not apply. The Supreme Court of Mississippi, in drawing the distinction between the Federal Kidnapping Statute and the Mississippi statute, said: "A defendant in this jurisdiction who enters a plea of

STATE *v.* ATKINSON

guilty is not assured that he will not receive the death penalty. Before the death penalty can be imposed under Section 2217 as interpreted in *Yates,* upon an accused's entering a guilty plea, the trial judge must submit the question of the type of punishment to a jury, which may impose either the death penalty or a life sentence."

In *Maxwell v. Bishop,* 398 F. 2d 138, the Court of Appeals for the Eighth Circuit, after a discussion of the Arkansas statutes, said: "Thus, in contrast to the Federal Kidnaping Act, an Arkansas defendant, by entering a plea of guilty in a capital case, does not avoid a trial by jury on the issue of punishment. The critical choice under the federal act which occasioned the result in *Jackson,* is thus not present under the Arkansas statutes."

It should be noted that North Carolina statutes make no provision for separate trials as to guilt and as to penalty by the same jury or by different juries.

Whether *Jackson* applied was only one of several constitutional questions considered in *Maxwell v. Bishop, supra. Certiorari* to review the Eighth Circuit's decision in *Maxwell v. Bishop, supra,* was granted December 16, 1968, 393 U.S. 997, 21 L. ed. 2d 462, 89 S. Ct. 488. In granting *certiorari,* the Supreme Court of the United States limited its review to Questions 2 and 3 of the petition which read as follows:

"2. Whether Arkansas' practice of permitting the trial jury absolute discretion, uncontrolled by standards or directions of any kind, to impose the death penalty violates the Due Process Clause of the Fourteenth Amendment?

"3. Whether Arkansas' single-verdict procedure, which requires the jury to determine guilt and punishment simultaneously and a defendant to choose between presenting mitigating evidence on the punishment issue or maintaining his privilege against self-incrimination on the guilt issue, violates the Fifth and Fourteenth Amendments?"

Although I rest my dissent primarily on *Jackson* and *Pope,* the questions awaiting decision by the Supreme Court of the United States in *Maxwell v. Bishop, supra,* directly involve the validity of the proviso of our G.S. 14-17. Uncertainty in respect of its validity should be removed by the decision in that case. It is noted that full arguments were heard by the Supreme Court of the United States in March, 1969. 37 U.S.L.W. 3330-3333.

Summarizing my views:

When the crime was committed and when defendant was arraigned,

tried and sentenced, the death penalty, under the North Carolina statutes then in force, was invalid and unenforceable. Under our statutes, the punishment for murder in the first degree is either death or life imprisonment. Upon invalidation of the death penalty, the only permissible punishment was life imprisonment. Consequently, my vote is to vacate the death sentence and to remand the case to the superior court for the pronouncement of a judgment of life imprisonment.

SHARP, J., joins in this opinion.